Sam SIMS, Jr., Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 3:89–0461.

United States District Court,
M.D. Tennessee,
Nashville Division.

Feb. 20, 1991.

Alfred H. Knight, Alan D. Johnson, Willis & Knight, Nashville, Tenn., for plaintiff.

Joe Brown, U.S. Atty., Glen Cagle, Dist. Director, IRS, Nashville, Tenn., Carl Q. Carter, Ann Reid, U.S. Dept. of Justice, Tax Div., Washington, D.C., for defendant.

## MEMORANDUM

WISEMAN, Chief Judge.

This action was brought by Sims for refund of withholding taxes paid on gambling winnings in the amount of $4,018.99 pursuant to 26 U.S.C. § 3402(q)(1). The government counterclaimed for the unpaid balance of the assessments against Sims in the amount of $959,790.83, plus statutory

additions. Sims also seeks preliminary and permanent injunctions restraining the Internal Revenue Service ("IRS") from collecting the balance of the taxes, penalty, and interest.

This Court held a bench trial on December 11, 1990. Pursuant to the Court's direction at the close of the trial, the parties have filed proposed findings of fact and conclusions of law. For the reasons stated below, the Court grants all relief requested by Sam Sims, Jr. and dismisses the government's counterclaim.

## I. *Facts*

Sims seeks a refund of withholding taxes, applicable to the years 1982, 1983, and 1984. The payments were made pursuant to the provisions of 26 U.S.C. § 3402(q),[1] which impose a withholding obligation upon persons who make payments of gambling winnings in excess of $1,000.

During the federal tax years 1982, 1983, and 1984, Sims was a "numbers banker" in Davidson County, Tennessee. As a banker of a gambling operation, Sims provided money to "runners," or "pick-up men," to pay winning bettors. The runners had no designated territory. They could obtain customers from wherever they found them, and they had the choice of taking their bets and betting slips to other numbers bankers instead of to Sims. Sims accepted business from virtually any runner who had an honest reputation. Sims generally did not know where the runners operated or the identities of their customers.

The runners wrote the customers' bets on a piece of paper, often leaving with the customer a duplicate copy of the betting slip. The slip identified the customer by a code name or initials. The runners would take the betting slips and the customers'

bets to S & S Discount House every day, or in some instances, Sims made arrangements to pick up the slips.

Sims exercised no control over how the runners conducted their businesses, how long or hard they worked, or how many bets they placed. If a runner proved to be dishonest in his dealings with his customers or with Sims, Sims would cease doing business with the runner, but the nature and extent of the runner's efforts would otherwise be his own affair.

Sims picked a daily winning number from various sources, such as the Dow Jones Average. Because the winning number had to contain three random digits, the odds of winning were necessarily 1000 to 1. The pay-off for a winning number was 700 to 1.

An employee of Sims would check all the bets against the winning number. Sims would then pay the runner who had brought in the winning bet. No one other than Sims or his brother ever paid the runners. Once the runners were paid the winning bets, the runners would deliver the winnings in cash to the customer.

Sims paid the runners in cash a percentage commission of the bets they collected, usually 10 to 20 percent, on a daily or weekly basis depending on the agreement between Sims and the runners. Alternatively, some runners would deduct their commission from the dollar amount of their bets prior to delivering the money to Sims.

Runners sometimes, in essence, "ran a tab" with Sims by turning in betting slips unaccompanied by cash. When this occurred, the runner's account would be debited accordingly and the amount of the debit would be deducted from any payment

---

**1.** Section 3402(q)(1) of the Internal Revenue Code states as follows:

Every person, including the Government of the United States, a State, or a political subdivision thereof, or any instrumentalities of the foregoing, making any payment of winnings which are subject to withholding shall deduct and withhold from such payment a tax in an amount equal to 20 percent of such payment. Section 3402(q)(3)(A) defines "winnings which are subject to withholding" as "proceeds of more than $1,000 from a wagering transaction,

if the amount of such proceeds is at least 300 times as large as the amount wagered." Section 3402(q)(6) provides the following:

Every person who is to receive a payment of winnings which are subject to withholding shall furnish the person making such payment a statement, made under the penalties of perjury, containing the name, address, and taxpayer identification number of the person receiving the payment and of each person entitled to any portion of such payment.

# 1050

of winnings Sims subsequently made to the runner. To the extent such payments did not cover winnings, the runner would supply the deficiency from his or her own funds.

Sims recognized no responsibility to the bettors. If a bettor complained to Sims about not being paid for a winning number, he would inform the runner of the complaint, but not make the payment himself.

Sims recorded the total "take" from bets each day and the aggregate winnings. He did not keep records of the amount of individual bets, nor did he record the individual winnings. He threw the betting slips away after a few days.

Sometime in the mid 1970's, but prior to 1976, Sims was approached by an Alcohol, Tobacco, and Firearms ("ATF") agent and an IRS agent regarding the manner in which he should maintain gambling records to insure compliance with federal excise and income tax laws. The agents advised him to maintain daily totals of receipts and disbursements, for purposes of paying federal gambling excise taxes. They further advised him to discard records of individual betting transactions, presumably in order to avoid state gambling prosecutions. Sims thereafter maintained records only of aggregate daily receipts and winnings, and not of individual transactions.

Sims never withheld any money from the winnings paid to bettors, nor filed a return with the IRS reporting any withholding on gambling winnings. In 1985 the IRS conducted an audit of Sims' income tax returns. During the course of the audit, the auditor, Stephanie Borop, determined that Sims was liable under the withholding provisions of 26 U.S.C. § 3402(q). The records Sims had kept were not sufficient for purposes of imposing the withholding and reporting obligations of § 3402(q). Because Sims' books and records listed the amounts of winnings in daily totals, rather than broken down by individual winnings, Ms. Borop determined that Sims was liable for withholding on winnings on each day in which the aggregate winnings exceeded $1,000.

Sims has paid a portion of the assessment for each quarter, and timely filed a claim for refund. The IRS disallowed the claim. Sims timely filed this suit for refund of taxes pursuant to 26 U.S.C. § 7422. The United States counterclaimed for the remaining balance.

## II.

Sims raises four legal questions in his proposed conclusions of law:

1. Whether § 3402(q) violates the compulsory self-incrimination clause of the fifth amendment;

2. Whether application of § 3402(q) by the government in this case violates the due process clause of the fifth amendment by imposing what amounts to a huge economic "penalty" on Sims for failing to do the impossible (report names and addresses of unknown bettors);

3. Whether the withholding and reporting provisions of § 3402(q) apply to Sims as the person who "controls" payment of winnings;

4. Whether the present assessment is invalid, under the proper burden of proof, as constituting either an excessive or a "naked" assessment.

The Court will discuss the first two legal questions only briefly because the third and fourth issues are dispositive of this case.

### A. Fifth Amendment Self–Incrimination

Sims argues that 26 U.S.C. § 3402(q) violates the compulsory self-incrimination clause of the fifth amendment to the United States Constitution, both on its face and as the government has applied it in this case. He asserts the provision is unenforceable against him because it requires him to keep records of and file returns for certain illegal gambling transactions, thus violating his fifth amendment privilege against self-incrimination. Moreover, he describes the IRS's assessment against him as a "punitive over-assessment" imposed because of his failure to keep individualized records of payouts to winning bettors. According to Sims, the choice between keep-

ing individualized records and filing returns and thereby risking prosecution under state and federal gambling laws versus not keeping records and not filing returns and thereby facing a "punitive over-assessment" is impermissible under the fifth amendment.

This constitutional argument is interesting and persuasive, but the Court need not decide the question in light of the holding below. It is a well-established principle that federal courts should not decide a constitutional question if there is some other ground upon which to dispose of the case. *Miami Univ. Assoc'd Student Gov't v. Shriver*, 735 F.2d 201, 203 (6th Cir.1984) (citing *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)).

### B. Deprivation of Property Without Due Process

■ Sims also contends that the government, in applying § 3402(q) to his gambling operation, has imposed an obligation which he could not possibly have performed, and that this governmental conduct constitutes an attempt to take his property without due process of law. Sims argues the withholding obligation forces him to forfeit money due to his failure to report and pay over taxes owed by other taxpayers, i.e., the winning bettors.

At trial Sims explained why he could not comply with the withholding requirements. Sims testified that any effort to follow the statute would have dissolved his business in short order; moreover, compliance might have placed him in a physically perilous position because winning bettors expected to be paid in full. The most compelling reason, however, is the impossibility of Sims' complying with the reporting provision of § 3402(q). Section 3402(q)(6) requires every person receiving a payment of winnings subject to withholding to "furnish the person making such payment a statement, made under the penalties of perjury, containing the *name, address*, and *taxpayer identification number* of the person receiving the payment and of each person

entitled to any portion of such payment." Emphasis added. The evidence at trial established that runners wrote customers' bets on pieces of paper which identified the customer only by a code name or initials. The runners then took the betting slips and the customers' bets to S & S Discount House, or Sims made arrangements to pick up the slips. After picking the winning number, Sims would pay the runners who had brought in winning bets, and the runners would take the money to the winning bettors. Thus, Sims could not conceivably comply with § 3402(q)(6) because he never knew the name, address, or identification number of any customer, and because the nature of his gambling operation was such that the customers never furnished the requisite information to Sims.

The government recognizes that Sims' compliance with the withholding requirements likely would have cut into his profit margin and would have been unpopular among his customers, but focuses on "the broad public interest in maintaining a sound tax system". *U.S. v. Lee*, 455 U.S. 252, 260, 102 S.Ct. 1051, 1057, 71 L.Ed.2d 127, 134 (1982). The government points out that there is no constitutionally guaranteed right to profitably run a numbers operation in violation of federal and state law. As for Sims' inability to comply with the reporting requirement, the government suggested at trial that Sims could at least remit withheld money to the government without identifying the taxpayers to whom the payments were to be credited.

The government is asking Sims and similarly situated numbers bankers to perform an impossible task when it seeks to enforce § 3402(q) against them. This contradiction is especially disturbing due to the voluntary nature of this country's system of taxation. However, although the Court is highly troubled by the applicability of § 3402(q)(6) to numbers bankers like Sims, the Court chooses not to base its holding on due process grounds. Due process requires that "the legislative means must bear 'a reasonable relation to a proper legislative purpose' and be 'neither arbitrary nor discriminatory.'" *U.S. v. Washington*, 879 F.2d 1400, 1401 (6th Cir.1989) (quoting

*Nebbia v. New York,* 291 U.S. 502, 537, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934)). Because of the government's established power to assess and collect taxes on unlawful gambling activities, this Court refuses to invalidate § 3402(q) on substantive due process grounds. *See U.S. v. U.S. Coin & Currency,* 401 U.S. 715, 717, 91 S.Ct. 1041, 1043, 28 L.Ed.2d 434 (1971).

### C. Inapplicability of § 3402(q) to Sims— No Control Over Payments

■ The withholding and reporting provisions of 26 U.S.C. § 3402(q) apply only to "employers." 26 U.S.C. § 3401(d) defines the term "employer" as follows:

> For purposes of this chapter, the term "employer" means the person for whom an individual performs or performed any service, of whatever nature, as the employee of such person, except that—
>
> (1) if the person for whom the individual performs or performed the services does not have control of the payment of the wages for such services, the term "employer" ... means *the person having control of the payment of such wages....*

Emphasis added. Sims argues the runners, not himself, had control of the payment of money to winning customers. Further, Sims posits that his lack of control over the payment process rendered it a practical impossibility for him to obtain the information required to be reported. According to Sims, unless the person has direct contact with the taxpayer from whom the funds are to be withheld, he is not in a position to insure that proper withholding occurs, or to obtain the information necessary to report the withholding to the government.

The evidence at trial showed that winnings were paid to the customers by the runners, otherwise known as "pick-up men." Sims had no direct contact with the bettors; he did not know their identities and could not have discovered them had he wanted to because they were identified only by a code on the betting slips. The auditor, Stephanie Borop, testified at trial that she imposed the assessment against Sims because he was the "source" of the funds from which taxes should have been withheld. He, in fact, controlled the fund from which payments to the runners were made; however, the runners and not Sims controlled payments of money to winning customers.

The government urges the Court to focus on who had ultimate authority to make payment of winnings and not on who physically delivered the winnings to customers. The government contends the runners acted merely as conduits or agents for Sims, pointing to trial testimony that Sims chose the winning numbers, determined and paid the runners the exact amount of winnings, and claimed a deduction on his federal income tax returns for payment of the winnings. Acknowledging that there is no case law interpreting § 3402(q), the government points the Court to other Internal Revenue Code sections requiring withholding of another's taxes. For example, the test under § 3401(d) to determine who is an "employer" is who actually determines the employees to be included in the payroll and the amounts they are to be paid. *Phinney v. Southern Warehouse Corp.,* 212 F.2d 488 (5th Cir.1954). Similarly, a "responsible person" who is "required to collect, truthfully account for, and pay over" employment taxes as defined in Section 6672 of the Internal Revenue Code is the person or persons with control of payment to creditors. The Fifth Circuit has explained that, to determine who is such a "responsible person", courts must search for "the person or persons who could have seen to it that the taxes were paid, a person with ultimate authority over expenditures of corporate funds who can fairly be said to be responsible for the corporation's failure to pay over its taxes." *Liddon v. U.S.,* 448 F.2d 509, 512–513 (5th Cir.1971), *cert. denied,* 406 U.S. 918, 92 S.Ct. 1769, 32 L.Ed.2d 117 (1972) (quoting 22 A.L.R.3d 8, 50 (1968)).

Sims directs the Court to case law indicating that it is the payment of funds to the taxpayer, not the provision of the funds for payment, which determines the withholding obligation. The Court rejects this position as overly general. The Court agrees with the government that, if the

person paying the funds to the taxpayer is merely a conduit for the person who represents the source of the funds, then the conduit should not bear the withholding and reporting obligation. However, the evidence at trial persuades the Court that the runners who took bets to Sims at S & S Discount House were more than mere conduits for Sims. They were independent contractors. The runners solicited their own customers with no intervention by Sims. Sims did not direct the runners to particular geographic areas for the procurement of customers. In fact, the runners were under no obligation to bring their business to Sims. They could take their business to any numbers banker. Furthermore, although Sims determined the winning customers and the amounts these winning customers were to receive, he gave the winnings to the runners who then assumed personal responsibility for paying the customers. Any customer who came to Sims because he or she was not paid for a winning ticket was directed by Sims to the runner with whom the customer had placed the bet. Thus, the runners shouldered the ultimate responsibility for paying their customers.[2]

The Supreme Court has stated "[b]ecause the employer is in a secondary position as to liability for any tax of the employee, it is a matter of obvious concern that, absent further specific congressional action, the employer's obligation to withhold be *precise and not speculative*." *Central Illinois Public Service Co. v. U.S.,* 435 U.S. 21, 31, 98 S.Ct. 917, 923, 55 L.Ed.2d 82, 91 (1978) (emphasis added). Based on the evidence discussed above, the Court is not convinced that Sims is an "employer" for purposes of the withholding provisions. Moreover, § 3402(q) is not "precise" in notifying numbers bankers like Sims that they are subject to withholding obligations. There are no reported cases applying § 3402(q) to a numbers banker. Sims' only guidance is the concept that persons who "control" payment of winnings are subject to withholding. How-

ever, as discussed above, Sims necessarily could not comply with a major requirement of § 3402(q) because he did not have the information about individual bettors required by § 3402(q)(6) to be reported. Due to this incongruity in the application of § 3402(q), Sims and other similarly situated numbers bankers may draw the logical inference that they are not persons having control of the payment of winnings within the meaning of § 3402(q) and that, therefore, the withholding provisions do not apply to them.

The Court finds that § 3402(q) is inapplicable to Sims because he was not in control of payments to winning bettors within the meaning of § 3401(d)(1). This finding dictates that Sims' request for relief be granted and that the government's counterclaim for collection of the balance of the assessment be dismissed.

### D. Invalid Assessment

Assuming § 3402(q) is a valid enactment, and even assuming Sims was the person in control of the payment of winnings to customers, the Court still must invalidate the government's assessment against Sims. Sims argues that the government's assessment is "naked" with no reasonable factual foundation or, at the least, excessive. The government argues the IRS made its determination based on a reasonable method and, therefore, the presumption of correctness should apply. The Court sides with Sims.

During the course of the 1985 IRS audit of Sims' business, the auditor, Stephanie Borop, determined that Sims was liable under the withholding provisions of § 3402(q). Sims had maintained records of total receipts and disbursements on a daily basis, but had retained no records of individual transactions which would reflect the amounts he had paid applicable to individual winnings in excess of $1,000. Ms. Borop proceeded to assess Sims on the assumption that, on every day in which he paid out more than $1,000, the entire amount was

---

**2.** Sims points out that the government has imposed a 1099 rather than a withholding obligation on him with respect to payment of commissions to the runners, on the implied premise that his relationship to them is one of independent contract, rather than employment.

applicable to individual winnings in excess of $1,000. The total amount subjected to the 20% assessment was $2,964,997.38, which was only $38,337.27 less than the total payouts of $3,003,334.65 for the tax years 1982, 1983, and 1984.

Sims testified at trial that he was unable to estimate the dollar amount of individual "hits" in excess of $1,000 paid during the tax years in question. He did testify that such hits were "rare", and that they would comprise a small fraction of the total hits paid during those years. In order to produce winnings in excess of $1,000, a bet of more than $1.40 would be required, and, according to Sims, such bets were very infrequent during the years in question.

The deposition testimony of two witnesses corroborates Sims' contention that $1,000 individual payouts were rare. Leon Walker, who used to operate as a runner for Sims, testified that, in the early 1980's, he "might have had six or seven hundred dollars a day" placed in bets. Walker Deposition at 8, 11. 22–23. When asked about the average amounts of his "hits", he responded that he "didn't have no real big hits.... never did average over $5.00, if I had a hit. Small amounts. You know, they hit for 60, $70.00, things like that." *Id.* at 11, 11. 15–16, 23–25. Ledford Owens, who used to pick up numbers for Sims, testified that on a daily basis he would turn in about 20 tickets, but that the average amount of winnings was about $70.00 ("you know, I don't pick up ... no big tickets ... nothing like that. I don't deal with them kind of people ... You know, something like some over two or three, $5.00, something like that, I didn't mess with that.... I go in the housing projects, and them people don't play that much money. They don't have the money to play." *Id.* at 12–13). Owens estimated his annual income from the numbers business in 1982, 1983, and 1984 at approximately $13,000. *Id.* at 14, 1. 18.

When a party pays part of the penalty existing for failure to pay withheld taxes and the government counterclaims for the remainder of the refund, the taxpayer has the burden of proving that the assessment was wrong. The assessment is presumed to be correct. *Sinder v. U.S.,* 655 F.2d 729, 731 (6th Cir.1981); *Calderone v. U.S.,* 799 F.2d 254, 258 (6th Cir.1986):

> However, the burden on the taxpayer is not merely a burden of producing evidence; it is a burden of persuasion by the preponderance of the evidence that the assessment is not correct. Only if that is shown must the government show, on its counterclaim, what the correct assessment is.

*Sinder,* 655 F.2d at 731. *See also Higginbotham v. U.S.,* 556 F.2d 1173, 1175 (4th Cir.1977) ("Once the taxpayer has proved that the Government's assessment is excessive, there is no sufficient justification for relieving the Government of the burden of proving what the taxpayer owes").

Moreover, the government always has the burden of proving the amount owed "where the assessment is shown to be naked and without foundation". *U.S. v. Janis,* 428 U.S. 433, 441–42, 96 S.Ct. 3021, 3026, 49 L.Ed.2d 1046, 1053–54 (1976). Regardless of the adequacy of the taxpayer's records, the government must always produce some significant evidence to support its assessments. *Id.* This principle applies even if the taxpayer's records are inadequate or nonexistent:

> The jurisprudence finds justification for the presumption that assessments are correct and for the taxpayer's burden of proof in the strong need of the government to accomplish swift collection of revenues and in order to encourage recordkeeping by taxpayers. The clandestine nature of gambling operations in most states and the frequent failure of bookmakers to keep records require applying the presumption of correctness to the Commissioner's reconstruction of the tax base by *any reasonable method* where adequate records have not been kept.

> Neither the tax collection in general nor wagering activities in particular, however, have ever been thought wholly to excuse the government from providing *some factual foundation for its assess-*

*ments.* The tax collector's presumption of correctness has a herculean muscularity of Goliathlike reach, but we strike an Achilles' heel when we find no muscles, no tendons, no ligaments of fact.

*Carson v. U.S.,* 560 F.2d 693, 696 (5th Cir.1977) (emphasis added).

■ The Court deems the IRS assessment against Sims "naked." The IRS simply assumed that all of the disbursements made by Sims on days in which total disbursements exceeded $1,000 were applicable to individual "hits" in excess of $1,000. The Court agrees with Sims that this conduct is not a good faith exercise of the taxing power, and effectively imposes a penalty on Sims for failing to keep individualized records of his gambling transactions. The requisite factual foundation is missing in this case. The government has made the highest assessment theoretically possible, based on the largest amount Sims possibly could have paid out applicable to $1,000 plus winnings.

The government contends the assessment based on Sims' records of actual daily aggregate winnings was reasonable, given odds of 1000 to 1. However, this argument necessarily assumes most of the bets were $1.40 or more, due to the 700 to 1 ratio for payoffs on winning tickets. The government is simply wrong in reasoning that Leonard Walker's testimony that he brought in $600 to $700 a day tends to show the average size of the bets was more than a dollar. Mr. Walker's own testimony reveals that he did not have any "real big hits", but rather had hits averaging around $60 to $70. The government also misconstrues the testimony of Ledford Owens in calculating the average size of his bets at $16. Owens testified in deposition that he picked up numbers in the housing projects and that he didn't pick up "big tickets", for $2, $3, or $5, for example, because his customers had very little to spend. Thus, the government has failed to show any reasonable factual foundation on which the IRS based its assessment against Sims.

However, even assuming such a factual foundation exists, the assessment still is invalid as excessive. Sims has shown by a preponderance of the evidence that the assessment is not correct. Thus, the burden of proof shifts to the government to show what the correct assessment is. *Sinder,* 655 F.2d at 731. The government cannot meet this burden of proof. Moreover, Sims' failure to keep individualized records does not excuse the government. Based on the government's failure to rebut Sims' charge of excessiveness with any credible evidence to support its assessment, the Court is compelled to grant Sims' request for refund and injunctive relief and to dismiss the government's counterclaim.

### III.

For the foregoing reasons, the Court grants Sims' request for a refund and denies the government's counterclaim for the balance of the assessment. The government is hereby permanently enjoined from collection of the balance of the taxes, penalty, and interest assessed by the IRS against Sims.