68 F.3d 476
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Stanley SIMS and Sam Sims, Jr., Defendants-Appellants.
 Nos. 95-5009, 95-5010.
 United States Court of Appeals, Sixth Circuit.
 Oct. 19, 1995.
 
 Before: ENGEL, NELSON, and SUHRHEINRICH, Circuit Judges.
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 The defendants, two brothers associated in the operation of a "numbers" operation, were tried in federal court on charges of conducting an illegal gambling business and a related conspiracy charge. Asserting an "entrapment by estoppel" defense, the defendants testified that they had been told by representatives of the United States Treasury Department that the federal government would not prosecute them if they purchased gambling stamps and paid a two percent federal excise tax. On cross-examination, in an attempt to prove that the defendants knew that their business violated federal law notwithstanding their compliance with the gambling tax requirements, the prosecution brought out the fact that during the trial of a prior federal tax case one of the brothers had been cautioned by the court that he was admitting, in his testimony, to a violation of 18 U.S.C. Sec.1955. The prosecution further brought out that this defendant had understood his situation well enough, during the earlier trial, to have invoked his Fifth Amendment privilege against self-incrimination.
 
 
 2
 The defendants were convicted on one of three counts of the indictment -- a count addressing conduct that occurred subsequent to the trial of the tax case. They appeal their convictions here, contending, among other things, that the trial court erred in failing to grant a mistrial on the basis of the cross-examination about the prior assertion of the Fifth Amendment privilege. We conclude that the convictions must be affirmed.
 
 
 3
 * Defendant Sam Sims, Jr., assisted by his younger brother, defendant Stanley Sims, ran a private lottery business for many years in Nashville, Tennessee. It is uncontested that the business violated Tennessee law.
 
 
 4
 Under 18 U.S.C. Sec.1955, it is a federal crime to conduct a gambling business that violates state or local law if the business involves five or more persons in capacities specified in the statute and has been in continuous operation for more than 30 days or has a gross revenue of $2,000 in any single day. The Sims' business appears to have met these criteria.
 
 
 5
 An indictment returned against the Sims brothers On September 3, 1992, charged them with conspiracy to violate Sec.1955 over a period of at least six years ending in or about December of 1991; with violating Sec.1955 from at least January of 1985 through September of 1990; and with violating Sec.1955 "[f]rom in or about at least May, 1991, and continuously thereafter up to and including at least December, 1991...."
 
 
 6
 This was not the first time Sam Sims had been a party to litigation with the federal government. Several years earlier he had sued the United States for a refund of withholding taxes paid on gambling winnings, and the government had counter-claimed for an unpaid balance of tax assessments totaling almost $1 million. The tax case was tried before Judge Thomas Wiseman in December of 1990. Mr. Sims prevailed both on his claim against the government and on the government's counter-claim. See Sims v. United States, 756 F. Supp. 1048 (M.D. Tenn. 1991).
 
 
 7
 Prior to the trial of the criminal case, which was conducted by Judge Robert Echols, the Sims brothers indicated that they intended to claim that they were the victims of a vindictive prosecution arising out of the tax case. The government filed a motion in limine asking the court, among other things, to prohibit the defendants from making such a claim before the jury. In a written opinion entered on May 9, 1994, the day before the trial started, the court denied this branch of the government's motion. On May 10, however, when counsel for Sam Sims told the court that he intended to refer to the tax case during opening statement, the court questioned the relevance of that case. There was no mention of vindictive prosecution during the colloquy that followed, and after the prosecutor stated that none of her witnesses would refer to the tax case, the court asked Sims' counsel not to mention the case in opening statement. The lawyer replied that he did not want the prosecutor to use the tax case in any way, "be it in our case or their case," and the prosecutor said that this was no problem, "I don't intend to touch it." The court then asked for an understanding that "we won't get into the matter of the prior lawsuit," adding that "[i]f it comes out in some way then any of the attorneys can ask to approach the bench and we'll try to deal with it at that time."[1] The court was not made aware, at this juncture, of the warning given by Judge Wiseman in the tax case.
 
 
 8
 Neither side mentioned the tax case in its opening statement to the jury. The government's opening statement described the elements of the crimes charged and summarized the evidence that would be offered to establish these elements. The defendants' opening statements focused on the Sims' brothers participation in a gambling tax "compliance program" promoted by the government. Counsel for defendant Sam Sims told the jury that the evidence would show that an agent of the Treasury Department's Bureau of Alcohol, Tobacco and Firearms called on Mr. Sims, explained the compliance program to him, and told him in substance that "if you pay these taxes and you go buy this license, you won't be prosecuted by the federal government. That is, ... you will be square. You will be legal. You will be in compliance with the federal law." Defendant Stanley Sims' lawyer described the compliance program as "sort of an amnesty plan ...."
 
 
 9
 After the government presented its case in chief -- a presentation in which no reference was made to the tax case -- Sam Sims took the stand as the first witness for the defense. In keeping with his counsel's opening statement, Mr. Sims testified, among other things, that an ATF agent had come to see him in the mid-1970s; that the agent had told him that he needed to buy a gambling stamp and would have to pay a two percent excise tax; and that the agent had "said that if we bought the stamp, we would not be prosecuted by the federal government. That we would be in line with the federal government laws." In reliance on what the agent had told him, Mr. Sims testified, he purchased gambling stamps and paid his excise taxes year after year.
 
 
 10
 On cross-examination the government suggested to Sam Sims that federal agents, accompanied by the prosecutor herself, had met with him as early as March of 1991 and discussed the possibility of his being prosecuted for gambling. Mr. Sims replied that he had been told that an investigation was going on, but asserted that "I don't remember hearing anything about gambling." The prosecutor then asked Sims if he had not been in court before Judge Wiseman on December 11 and 12, 1990, and if his attorney had not objected at that time to his being questioned about his gambling activities.[2] Mr. Sims acknowledged having had a case before Judge Wiseman, but said that he did not remember his attorney objecting to inquiry about his gambling activities.
 
 
 11
 Under further questioning, Mr. Sims agreed that if he had heard it stated in open court, during the trial of the prior case, that "everybody knows that numbers is a violation of Tennessee law," and that "if it is big enough and [has] got enough people involved it is a violation of federal law," such a statement would have put him on notice. The prosecutor then handed Mr. Sims a transcript provided by the defense as an exhibit to a pre-trial motion in the criminal case. Mr. Sims was asked to read aloud the following objection that his lawyer in the tax case, Mr. Alfred Knight, had raised when Mr. Sims was asked if he had been conducting numbers operations in September of 1990, a time when his establishment had been raided by the metropolitan police:
 
 
 12
 "MR. KNIGHT: Please the Court, I object. Number one, the ground of relevance and, number two, since it is irrelevant I think we have a Fifth Amendment problem about this. There is a pending case involving that raid ...."
 
 
 13
 His current lawyer interposing no objection, Mr. Sims read aloud from the transcript as requested. He then went on to read (still without objection) a passage in which Judge Wiseman had said "everybody knows that numbers is a violation of Tennessee law," adding that "if it is big enough and [has] got enough people involved, it is a violation of federal law." And from a different section of the transcript, Mr. Sims read this sentence: "You know, everything you ask him to tell you on the tax return makes him guilty of a violation of 18 United States Code, Section 1955, and makes everything he has subject to forfeiture."
 
 
 14
 The prosecution then had another transcript marked as an exhibit and asked Sam Sims if he had been present when the court addressed Stanley Sims in the trial of the tax case. Mr. Sims replied in the affirmative, whereupon he was handed the transcript and asked to state what Judge Wiseman had told Stanley Sims. Without objection, Sam Sims read the following excerpt from the transcript:
 
 
 15
 "THE COURT: Mr. Sims ... by the testimony you are giving right now you are admitting to a violation of United States Code 18, Section 1955a in that you are admitting to being one of those persons who conducts, finances, manages, supervises or actually owns all or part of an illegal gambling business which subjects to a possible fine of not more than 25,000 dollars -- "
 
 
 16
 This rendition was followed, in the criminal trial, by the following question and answer:
 
 
 17
 "Q. We don't need to get into the fine. So the court again stated to your brother that what you are doing was a violation; is that correct?
 
 
 18
 A. I suppose so, yes."
 
 
 19
 On redirect, Sam Sims testified that he had not understood the legal significance of the statements made in the trial of the tax case. "It passed my mind," he asserted. "I never even thought about it."
 
 
 20
 Upon the completion of Sam Sims testimony, the defense called Stanley Sims. He too described a visit from government agents in which Sam Sims was told "that you had to comply with the gambling stamp program to operate the numbers business." Sam agreed to comply, he testified, and federal agents were fully aware of Sims' operation of the numbers business in subsequent years. Stanley Sims purchased gambling stamps every year through June of 1993, he testified, and he said that he believed that he would be in compliance with federal law if he got the stamps. He was willing to take his chances with the State of Tennessee.
 
 
 21
 Mr. Sims further testified on direct examination that he had appeared as a witness at the trial of his brother's civil tax action against the government in December of 1990; that he recalled Judge Wiseman warning him about testimony he was giving; and that he was not sure what Judge Wiseman was warning him about, because he had purchased a federal tax stamp. He added that he did not have a lawyer and did not consult a lawyer at that time.
 
 
 22
 Stanley Sims went on to testify, without objection by the government, that because he had been buying the gambling stamps, paying his taxes, and talking to federal agents over the years, he did not understand why he had been indicted in federal court. He said that he thought "the government might have been a little revengeful" after Sam won the tax case.
 
 
 23
 On cross-examination, Stanley Sims testified among other things that he did not know exactly what Judge Wiseman had said to him about his activities being a violation of federal law. The prosecutor read him Judge Wiseman's words from the transcript and asked, without objection, if this was what the court had told him. "Probably so," Mr. Sims replied, "but I wouldn't know what that meant." This assertion triggered the following exchange:
 
 
 24
 "Q. You didn't know what it meant but you knew enough to assert the privilege and not talk any further about it, didn't you?
 
 
 25
 A. Well, there were other people there, and I had been raided by the state so I didn't know what could have been.
 
 
 26
 Q. And in fact you did assert your privilege?
 
 
 27
 A. Oh, sure."
 
 
 28
 During none of the questioning detailed above did counsel for either of the defendants interpose any objection. After the jury had been excused at the end of the day, however, Sam Sims' lawyer moved for a mistrial based on the government's questioning of Stanley Sims about the exercise of his Fifth Amendment privilege. Stanley Sims' lawyer joined in the motion. The court overruled the motion, explaining that the questioning had been highly relevant to the issue of Stanley's understanding of the scope of the compliance program. The court offered, however, to instruct the jury that exercise of the Fifth Amendment privilege raised no presumption of guilt and that no adverse inference should be drawn from the exercise of this constitutional right. To avoid waving a red flag during the presentation of the defendants' case, defense counsel asked that such an instruction be included in the charge given the jury at the end of the trial. The court complied with this request, instructing the jury as follows during the course of a very long and carefully crafted charge:
 
 
 29
 "You have heard testimony that one of the witnesses in this case invoked his Fifth Amendment right against self-incrimination in a prior civil trial. You should remember that no negative inference of any kind may be drawn from the fact that a witness decided in an unrelated matter to exercise his or her privilege under the Constitution by not testifying, or by refusing to answer a question."
 
 
 30
 The closing arguments presented by counsel immediately before the court's charge to the jury did not refer directly to any invocation of the Fifth Amendment. The prosecutor did allude briefly to the warning Judge Wiseman had given in December of 1990 about numbers being a violation of Tennessee law and of federal law as well if the operation was big enough and had enough people involved. "And [Judge Wiseman] went on to tell them," the prosecutor added, "that they were admitting to being in violation and talked to them about their privileges." The prosecutor did not explicitly remind the jury that Stanley Sims had in fact invoked his Fifth Amendment privilege.
 
 
 31
 The jury acquitted the defendants of both the conspiracy charge and the charge of a substantive violation of 18 U.S.C. Sec.1955 continuing through September of 1990. As to the charge of a violation of Sec.1955 from and after May of 1991, however, the jury found both defendants guilty. A timely notice of appeal was filed following the denial of the motion for a new trial and the imposition of sentence.
 
 II
 
 32
 In Doyle v. Ohio, 426 U.S. 610 (1976), the Supreme Court held that it was a violation of the Due Process Clause of the Fourteenth Amendment for a state prosecutor to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to tell the story at the time of his arrest, after his receipt of the warnings required under Miranda v. Arizona, 384 U.S. 436 (1966). "Silence in the wake of these warnings," the Supreme Court said, "may be nothing more than the arrestee's exercise of these Miranda rights." Doyle, 426 U.S. at 617. Because of the requirement that Miranda warnings be given, the Court continued, "every post-arrest silence is insolubly ambiguous ...." Id. No one could know, in other words, whether the defendant was remaining silent because he had not yet invented an appropriate story or because he had just been told of his right to remain silent. "Moreover," the Court concluded, "while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." Id. at 618 (footnote omitted).
 
 
 33
 Nothing in Doyle compels the conclusion that it was plain error for the trial court to countenance the questioning that occurred in the case at bar. It was not inappropriate, first of all, for the prosecutor to bring out Judge Wiseman's warning to Stanley Sims as a means of refuting the defendants' contention that they had been unaware that their numbers operation violated federal law.[3] As to lawyer Alfred Knight's very brief reference to a Fifth Amendment "problem" with an allegedly irrelevant question posed to Sam Sims in the tax case, the jury is unlikely to have understood this as suggesting that Sam Sims was invoking his privilege not to testify. The fact that Sam's brother Stanley invoked the Fifth Amendment privilege was clearly brought out, to be sure, but not in a context where his silence was "insolubly ambiguous" in the sense that Mr. Doyle's silence was ambiguous. No Miranda warnings were involved here, and on the facts presented it does not seem to us that Judge Wiseman's cautioning of Sam Sims carried any implicit assurance that he could invoke the Fifth Amendment privilege without having to worry that someone might subsequently point to his having done so as evidence that he understood he was not immune from prosecution under 18 U.S.C. Sec.1955.
 
 
 34
 A more serious problem, perhaps, is posed by Griffin v. California, 380 U.S. 609 (1965), where the Supreme Court held it a violation of the Self-Incrimination Clause of the Fifth Amendment, as made applicable to the states by the Fourteenth Amendment, for the prosecutor in a murder case to argue to the jury that the defendant's failure to testify showed that the defendant was guilty of the crime charged. "[C]omment on the refusal to testify," the Supreme Court said, "is a remnant of the inquisitorial system of criminal justice, which the Fifth Amendment outlaws." Id. at 614 (internal quotation omitted).
 
 
 35
 In the case at bar the prosecutor's closing argument contained no direct comment on Stanley Sims' exercise of his Fifth Amendment privilege. The very asking of the question about assertion of the privilege, however, constituted a form of comment thereon. It would have been better, in our view, had the question been left unasked. The curative instruction given by the trial court in the manner requested by the defense made it clear to the jury, however, that "no negative inference of any kind" could be drawn from the exercise by the witness of his constitutional privilege to refrain from answering questions in an unrelated proceeding. This instruction having been offered, and no significant prosecutorial misconduct having occurred, see Namet v. United States, 373 U.S. 179 (1963), we are satisfied that the trial court did not abuse its discretion in declining to declare a mistrial and in subsequently denying the motion for a new trial. Even in cases of flagrant prosecutorial misconduct, "a reviewing court will refuse to find reversible error if the circumstances occurred only briefly during a long trial [in the case at bar the trial lasted some seven days] and the court sufficiently instructed the jury to disregard them." United States v. Clark, 988 F.2d 1459, 1464 (6th Cir.), cert. denied, 114 S.Ct. 105 (1993).
 
 III
 
 36
 * In view of their reliance on the defense of entrapment by estoppel, the Sims brothers contend that the trial court committed reversible error when it failed to include some definition of the term "knowingly" in the jury instructions on the substantive crime. We find the argument unpersuasive.
 
 
 37
 The crime spelled out in 18 U.S.C. Sec.1955 is a general intent crime, where "a defendant need not be shown to have acted willfully in the sense of intentionally violating a known state legal duty." United States v. Conley, 859 F. Supp. 909, 930 (W.D. Pa. 1994); see also United States v. Hawes, 529 F.2d 472, 481 (5th Cir. 1976). If the gambling offense were a specific intent crime, the "entrapment by estoppel" defense would not be available. Conley, 859 F. Supp. at 930. Accordingly, "the issue of fundamental unfairness due to the defendant's reliance on misleading government conduct is independent of the element of intent." Id. at 928; United States v. Brebner, 951 F.2d 1017, 1025 (9th Cir. 1991); United States v. Smith, 940 F.2d 710, 714 (1st Cir. 1991). The district court did not err in failing to instruct the jury on the meaning of "knowingly," and the instructions as a whole were both comprehensive and fair.
 
 B
 
 38
 The defendants argue that their convictions should be overturned for a number of other reasons, all of which are without merit. First, the introduction of evidence that the brothers continued their gambling business into 1992 did not constitute a material and prejudicial variance and did not impermissibly broaden the basis on which the jury could convict. The language of the count in the indictment on which the defendants were found guilty was sufficiently flexible that no precise dates were required. See United States v. Ford, 872 F.2d 1231, 1236 (6th Cir. 1989). That the dates were open-ended changed neither the theory of the case, the substantive crime with which the Simses were charged, nor the essential elements of the crime. See United States v. Atisha, 804 F.2d 920, 927 (6th Cir. 1986), cert. denied, 479 U.S. 1067 (1987). Even if a variance had occurred, moreover, it is hard to see how this prejudiced the defense, since the Sims brothers never denied running a gambling business. See United States v. Robison, 904 F.2d 365, 369 (6th Cir.), cert. denied, 498 U.S. 946 (1990).
 
 
 39
 Second, the defendants have failed to show that the district court abused its discretion when it determined that documents which a government witness mentioned during his testimony at trial, but which had not been turned over to the defense, did not relate to the witness' testimony. Compelled disclosure of statements under the Jencks Act, 18 U.S.C. Sec.3500(b)-(c), is limited to statements related to the witness' testimony. United States v. Sturman, 951 F.2d 1466, 1486 (6th Cir. 1991), cert. denied, 504 U.S. 985 (1992). The defendants' conclusory argument -- that a substantial error must have occurred because the only count on which the defendants were convicted was the count about which this witness testified -- is insufficient to carry the burden of showing abuse of discretion.
 
 
 40
 Sam Sims also argues that his conviction should be reversed because the district court wrongly excluded an affidavit he had provided to the Internal Revenue Service in 1988 and because he was unfairly ambushed by testimony about a meeting he and a government witness had with an informant who subsequently submitted a report of the meeting to his controller. It is clear Mr. Sims was not prejudiced by any of this. The events in question both took place in 1988, and the jury acquitted the defendants of the gambling count that encompassed the 1980s.
 
 
 41
 The defendants contend that the district court committed reversible error in prohibiting reference to the trial of the tax case prior to the point at which the government raised that topic on cross-examination of Sam Sims. In light of the circumstances described at length in Part I of this opinion, and as stated in note 3, supra, we do not find this contention persuasive.
 
 
 42
 Finally, the defendants argue that the district court erred in sending unadmitted transcripts of taped conversations into the jury room. The tapes were apparently made when Sam Sims took bets from a confidential informant in June and July 1991. The tapes themselves had been admitted into evidence; the transcripts had not, although the jury was given copies of the transcripts when the tapes were played in court. The jury was properly instructed that where there is a discrepancy between tape and transcript, the tape controls. See United States v. Robinson, 707 F.2d 872, 878 (6th Cir. 1983).
 
 
 43
 Sending the unadmitted transcripts to the jury was not in strict accordance with the rules of evidence. See United States v. Sababu, 891 F.2d 1308, 1333 (7th Cir. 1989). Because the Sims brothers admitted that they ran a gambling business, however, it is difficult to see how they could have been prejudiced by a government witness corroborating their own testimony. Any error in giving the jury access to unadmitted transcripts was harmless.
 
 
 44
 For the foregoing reasons, and for the reasons given by Judge Echols in the memorandum opinion issued in connection with the denial of the motion for a new trial, the convictions are AFFIRMED.
 
 
 45
 ENGEL, Circuit Judge, concurring.
 
 
 46
 I fully concur in both the result and rationale of the majority opinion. I write only to express more fully my own thoughts on two areas.
 
 
 47
 I fully agree, for the reasons stated by the majority, that Doyle v. Ohio, 426 U.S. 610 (1976), particularly as more recently narrowed by the Supreme Court, can in no way be construed to command the result the defendants claim. My own views on the law in this regard have already been set out in my dissent in Weir v. Fletcher, 658 F.2d 1126 (6th Cir. 1981), rev'd, 455 U.S. 603 (1982).
 
 
 48
 Our court is, of course, bound by Supreme Court precedent; hence my dissent when Weir v. Fletcher was before our court. At the same time, I do not think it inappropriate to express an individual view that perhaps the time has come when the underpinnings of Doyle should be reexamined. In the nineteen years since it was decided, Doyle has provided few of the benefits it was expected to produce. Instead it has generated a great deal of litigation in its interpretation, particularly when applied to other circumstances, of which this case is a classic example. In my opinion, the defendant in a criminal case, should not be permitted to use the administration of Miranda rights as a sword when he uses his own testimony to exculpate himself from liability.
 
 
 49
 The reasons why Doyle should not apply under these facts are well illuminated by the majority opinion. There was no formal administration of the Miranda warnings at all. The precautions were simply given by a conscientious trial judge in a civil trial setting in which the defendant was appearing and represented by counsel. The situation is much different where a person is subjected, without the presence of counsel, to an arrest with all the dangers it poses for any citizen, guilty or innocent. More than that, even assuming a potential for harm, a jury, if properly instructed by the court (as here), can be entirely sympathetic to the reasons for the exercise of the right to remain silent. Most of us under like circumstances would probably do the same. Properly instructed, a jury can quite easily understand this and fully discount the irrelevancy of silence and, of course, defense counsel can make the same argument to the jury.
 
 
 50
 The defense in this case was no defense, i.e., that the defendant was justified in believing that he could violate Tennessee gambling laws and yet be immune from any liability for federal prosecution if he but paid the necessary federal gambling tax. If, when he testified before Judge Wiseman in the civil tax refund action, Sims was advised by the judge of the potential dangers of his testimony he, like most persons, would still probably take that advice to remain silent no matter whether he agreed with the correctness of that advice.
 
 
 51
 Getting back to Doyle, I have always believed that departing from the broad rules of cross-examination merely because the witness is also a defendant conflicts seriously with the fundamental interest of courts in the full development of the facts in the controversies before them. I see no cogent reason why a criminal defendant who takes the stand in his own defense should not be accorded the same treatment as any other witness in the case. There already exist adequate antidotes to any perceived unfairness and even without them it is difficult for one to perceive any harm of constitutional proportions.
 
 
 52
 As we make clear in the per curiam, Sims was legally wrong in his major premise that an election to pay a federal gambling tax would render him immune from federal liability. He sought to make a defense of that which in law was no defense but rather an appeal to the emotions of the jury to act contrary to the trial judge's instruction. It is true that a jury may from sympathy acquit a defendant who is guilty beyond a reasonable doubt and thus insulate him from retrial under double jeopardy rules. However, this does not confer upon the defendant any right to compel the trial judge to instruct the jury that it may so disregard its legal duty to convict.
 
 
 53
 It is this latter observation which leads me to concur also in the majority's opinion that due process was not offended by the particular conduct of the prosecutrix in cross-examining Sims upon an issue which had been declared out-of-bounds by the court. This lapse could give me far more serious concern under circumstances other than those at hand, for I consider the prosecutrix's injection of the issue without the court's permission as out of line. On the other hand, I do not view this conduct as impugning the fundamental integrity of the jury's verdict of guilt.
 
 
 54
 It was virtually certain from the defense's opening statement, even though no question of the Miranda warnings was raised directly, that the sole defense would be a bona fide belief of the defendants that they were not in violation of the law. It had to be equally apparent that an interrogation into the knowledge of the defense concerning the legality of what they did was critical to this defense, at least to the extent that the defendants-were-expecting to raise a defense which in law was no defense. The crux of the defendants' argument, as I understand it, is that by being prevented from injecting the collateral issue fully on opening argument, they were left in the position of appearing to have covered up an admission until the prosecutrix exposed it on cross-examination.
 
 
 55
 Because of the standing ruling of the trial court, the issue was not raised by the defendants in their opening statement. However, everyone had to know that the defendants would, right or wrong, seek to take advantage of it. So long as the defendants did not take the stand, I suppose it was proper for the trial judge to have excluded any reference to that defense, on a basis of relevancy if nothing else. Once the irrelevant defense was presented to the jury, the government certainly had the right to point out that these protestations of good faith were less reasonable in fact than the defendants would have the jury believe.
 
 
 56
 Nevertheless, it was at least unfair for the prosecution not to apply first to the district judge for permission to cross-examine on the Miranda question before proceeding. To me there was little "surprise" which justified the government in unilaterally overriding the court's earlier standing rule concerning the subject. The ploy seems intended to leave the impression about which defendants now complain: they were hiding important but detrimental evidence from the jury. It is this ploy to which I object. If another judge in another trial like this had held that it was so prejudicial to the defendant's rights as to cause a mistrial, I doubt that I would vote to overrule it, out of respect for the trial judge's ability to weigh the actual impact of such conduct upon the ultimate jury verdict. The very fact that the jury acquitted on charges of gambling activity arising prior to the time Judge Wiseman's warnings were given is persuasive that it was in fact affected by this circumstance, for there seems no other reason for the differences between the verdicts.
 
 
 57
 The commands of Berger v. United States, 295 U.S. 78, 88-89 (1935), are not written in terms of specific violations but generally in view of prosecutorial misconduct which is so fundamentally unfair as to place in question the integrity of the verdict. That simply did not occur in this case, but it surely could in another. I write separately simply to indicate my view that this is a far more serious matter than the government would seem to argue, even though I fully agree with the majority opinion that it did not rise to the level of reversible error under the facts of this case.
 
 
 
 [1]
 Some months later, in an opinion denying a motion for a new trial, the court said that it had concluded after pretrial hearings that "the criminal charges were not the result of vindictive or selective prosecution." The opinion went on to state that "in view of its prior rulings on motions filed by the parties," the court had ruled that "evidence relating to the prior civil trial was not relevant to the issues to be decided by the jury in the criminal case." The accuracy of the court's recollection has not been challenged here
 
 
 [2]
 The prosecutor did not approach the bench before undertaking this line of questioning, but there was no contemporaneous objection. The court subsequently stated, in overruling the defendants' motion for a new trial, that if the government had approached the bench to request permission to ask these questions on cross-examination, permission would have been granted
 
 
 [3]
 In the light of hindsight, it appears unfortunate that counsel for Sam Sims was precluded from referring to the tax case in his opening statement. Given the fact that the trial court had not been informed of Judge Wiseman's warning, however, we cannot fault the court for trying to keep the opening statements free of extraneous matter -- and we are not persuaded that the prosecutor was guilty of deliberate prevarication when she said that she did not intend to touch on the tax case