**CHICAGO MILWAUKEE CORPORATION,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

No. 92–462T.

United States Court of Federal Claims.

April 23, 1996.

Joel J. Africk, Chicago, Illinois, attorney of record, for plaintiff.

George L. Squires, Washington, DC, with whom was Assistant Attorney General Loretta C. Argrett, for defendant.

## OPINION

REGINALD W. GIBSON, Senior Judge:

### INTRODUCTION

This tax refund suit, following a trial on the merits, presents the issue of—whether plaintiff, Chicago Milwaukee Corporation, was liable for certain employment taxes previously paid pursuant to the Railroad Retirement Tax Act (RRTA), 26 U.S.C. §§ 3201–33 (1994). These taxes were paid shortly after plaintiff (and its predecessor in reorganization) made lump-sum payments to former railroad employees who had previously entered into an agreement with the trustee to

continue working for reduced wages during the reorganization period. The RRTA at issue imposes an employment tax similar to, *and in lieu of,* the Federal Insurance Contributions Act (FICA), 26 U.S.C. §§ 3101–28 (1994), on the compensation paid to *railroad* employees by their employers. Similar to the FICA, the tax under the RRTA is imposed, in part, on the employee and, in part, on the employer, with the latter responsible for withholding the employee's share and also required to pay over both portions to the IRS. Plaintiff has brought suit, at bar, seeking a full refund *of both* the employees' and employer's portions of RRTA taxes it alleges were erroneously paid to the government.

After a careful consideration of the evidence and the arguments of counsel, this court is constrained to conclude that the two payments at issue are properly subject to the RRTA because *both* payments were, *inter alia,* "compensation," when earned and received, for services rendered by the recipients, inasmuch as the bankruptcy trustee and the subsidiary company were railroad "employers" *at the time said services were rendered,* and because the payees were in fact railroad "employees" at the time the services were rendered, all as defined in the RRTA and accompanying regulations. Accordingly, plaintiff has failed to meet its burden of proving an entitlement to a tax refund. Therefore, for the reasons detailed hereinafter, judgment must be entered for defendant, and the complaint (as amended) dismissed.

## FACTS

In this case, the facts are *not* in dispute. The parties have filed comprehensive joint stipulations of fact, which the court hereby incorporates by reference, and said facts are found accordingly. In addition, a trial was held in Washington, D.C., on March 18, 1996. At that time, the parties introduced various documentary exhibits (including the joint stipulations, JX 2) into the record, but chose to call *no* witnesses. The following operative facts, provided for the reader's convenience, are found from the stipulations as well as the exhibits.

The Chicago, Milwaukee, St. Paul and Pacific Railroad ("Milwaukee R.R.") was a class one (1) transcontinental railroad that provided transportation, subject to the jurisdiction of the Interstate Commerce Commission (ICC) (*see* 49 U.S.C. § 10501 (1988)) over nearly 10,000 miles of track in the mid- and northwestern United States. Plaintiff, Chicago Milwaukee Corporation (CMC), a holding company, owned virtually all of the stock (96% of the common and 92% of the preferred, as of 1980) in Milwaukee R.R. On December 19, 1977, Milwaukee R.R., facing insolvency, filed a petition in the U.S. District Court for the Northern District of Illinois, Eastern Division ("the reorganization court") to effect a plan of reorganization under the Bankruptcy Act of 1898. *See* 11 U.S.C. § 205 (1976) (repealed 1978). Thereafter, in early 1978, Stanley Hillman, and later that year Richard Ogilvie, were appointed by the reorganization court as Trustee ("the Trustee") for Milwaukee R.R.

By March 1980, Milwaukee R.R., under the control of the Trustee, had ceased operations over most of its lines. The Trustee, over time, had abandoned rail lines which were being sold, along with timber property, to generate cash for the reorganization. However, by September 1981, the Trustee came to the conclusion that wage concessions from Milwaukee R.R.'s employees would be necessary if the railroad was to continue operations during the period of reorganization. In addition, in response to the Trustee's November 1981 request to borrow $60 million to finance continued railroad operations, the reorganization court directed that the money could not be borrowed *unless* the Trustee obtained necessary wage concessions. Therefore, with the reorganization court's permission, the Trustee began wage reduction negotiations with the rail labor unions.

Following thereon, in early 1982, rail labor (*i.e.,* 16 unions), as well as management employees, and the Trustee entered into a Wage Reduction Agreement ("WRA"), which the reorganization court approved on January 29, 1982.

In part, the WRA provided, *inter alia,* as follows:

(a) for a *7% reduction in taxable wages of all* [Milwaukee R.R.] *employees* beginning January 1, 1982 and ending on the

earliest of (i) merger, sale, or reorganization of currently operated rail lines; (ii) cessation of operations and commencement of liquidation; or (iii) January 1, 1985. (WRA ¶¶ 1, 3–7.)

(b) for a contingent incentive bonus payable to [the] employees in the event that [Milwaukee R.R.] is reorganized for each of the first five years after the year such reorganization is consummated. (WRA ¶ 8.)

(c) for *the return to employees* who had wages reduced under the WRA *of up to the amount by which wages were reduced* in the event all or substantially all [Milwaukee R.R.] ... lines currently operated are sold or merged for a consideration that exceeds the ICC book value. The precise amount to be repaid would vary with the purchase price as the purchase price increased above the ICC book value up to the amount by which wages were reduced.

JX 2 at 7–8, Joint Stipulation (Jt.Stip.) ¶ 19 (emphasis added). Between the stipulated period, January 1, 1982 and December 31, 1984, the employees had their wages reduced by an aggregate total of approximately $35 million.

At the time of the WRA, there were no prospective purchasers for Milwaukee R.R.'s railroad lines. However, by 1984, there were three bidders for the rail operations of Milwaukee R.R. These bidders were Grand Trunk Corporation, Chicago and Northwestern Transportation Company, and the Soo Line Railroad Company ("Soo Line"). Eventually, after an ICC vote in favor of the Soo Line proposal, the reorganization court approved Soo Line's offer to purchase the railroad lines of plaintiff. Shortly thereafter, on April 6, 1984, the Trustee and the Soo Line, and Soo Line's affiliate, SLRCO, Inc., entered into an Asset Purchase Agreement ("APA"), according to which the Trustee agreed to sell to Soo Line all of Milwaukee R.R.'s "Rail Assets" in exchange for $148 million (subject to adjustments) plus the assumption by Soo Line of Milwaukee R.R.'s "rail liabilities."

Under the terms of the APA, Rail Assets included "all interests of the Trustee in real property and fixtures ... essential to the provision of rail services," as well as "all machinery, equipment, vehicles and items of tangible personal property owned by the Trustee and used or held for use in the conduct of the Railroad (other than leased property)." JX 2 at 9–10, Jt. Stip. ¶ 24(a). "Rail Assets" *did not* include, however, several identified rail lines. Furthermore, despite the assumption of plaintiff's rail liabilities by Soo Line, pursuant to the APA, the Trustee remained responsible for his obligations under the WRA. The ICC found, on September 12, 1984, that the APA should be approved, and, on February 19, 1985, the reorganization court approved the sale of Milwaukee R.R.'s "Rail Assets" stating that, upon consummation of the APA, all common carrier obligations of the Trustee and Milwaukee R.R. would be assumed by Soo Line and SLRCO.

While the APA excepted *five* (5) railroad lines from the sale of assets, *after* February 19, 1985, neither the Trustee, Milwaukee R.R., its successors, nor their employees engaged in any activities related to the transportation of passengers or property by railroad. Rather, with respect to these five railroad lines, Milwaukee R.R. and its successors retained ownership of the underlying real property over which others (predominantly Soo Line pursuant to lease arrangements) operated railroads. As of February 19, 1985, the land over which the five excepted lines operated constituted about 2% of Milwaukee R.R.'s total real estate holdings. On April 2, 1985, the ICC ruled that the Milwaukee R.R. was "no longer operating as a common carrier" and that, therefore, Milwaukee R.R. was no longer subject to the ICC's general jurisdiction. Jt. Stip. ¶ 33.

Because of a disagreement between the Trustee and Soo Line over the exact purchase price under the APA, the Trustee was unable to fix the amount to which the employees were entitled pursuant to the WRA. Eventually, as a result of a letter from a Soo Line official, the Trustee was able to determine that the employees who had had their wages reduced *during 1982–1984* would at least be entitled to 66% of the amount by which their wages were reduced upon the definitization of the purchase price. Accord-

ingly, on October 16, 1985, the Trustee distributed payments equalling 66% of the wage reductions to the former employees.

Subsequently, in November 1985, pursuant to an order of the reorganization court, the Trustee transferred all rights and interest in the estate back to Milwaukee R.R., which was renamed CMC Real Estate Corporation ("CMC Real Estate"). Finally, in July 1986, CMC Real Estate and Soo Line resolved the disagreement over the cash purchase price of Milwaukee R.R.'s Rail Assets. The final negotiated purchase price, approved by the reorganization court on September 12, 1986, was sufficient to entitle the former employees of Milwaukee R.R. to the full remaining 34% of their reduced wages. Thus, on or about September 22, 1986, CMC Real Estate made a second payment to the former Milwaukee R.R. employees for the remaining 34%.

In connection with each of these payments, compensating the former employees by the repayment for their reduced wages during the WRA, both the Trustee and CMC Real Estate withheld from the employees' payment checks the applicable payroll taxes under the RRTA. In addition, in both cases, the Trustee and CMC Real Estate, respectively, also paid the employer portion of the RRTA tax. With respect to the October 1985 payment, the Trustee paid the employee and employer portions of the tax to the IRS on October 18, 1985, and filed its RRTA tax return for 1985 with the IRS on April 17, 1986. Respecting the second payment in September 1986, CMC Real Estate paid both portions of the RRTA tax to the IRS on October 3, 1986. On January 28, 1987, CMC Real Estate filed its RRTA tax return for 1986 with the IRS. CMC Real Estate also filed FICA returns for 1985 and 1986.

By the time of the first payment in October 1985, *virtually all* of the former Milwaukee R.R. employees who had been subject to the

the WRA had terminated their employment with Milwaukee R.R. (and its successors) and were in the employ of Soo Line. Only nine (9) individuals who had been subject to the WRA remained in the employ of Milwaukee R.R. and, later, CMC Real Estate. None of these nine employees were engaged in railroad operations. Rather, each of these individuals was engaged in real estate activities unrelated to railroad operations.

On or about April 22, 1988, CMC Real Estate filed timely administrative claims with the IRS for refunds of the employment taxes paid by it and the Trustee in connection with the October 1985 and September 1986 payments to the former employees pursuant to the WRA.[1] For four years the IRS took no action on these claims. In the interim, CMC Real Estate was liquidated into its parent corporation, CMC. On July 9, 1992, CMC filed suit in this court seeking a refund of RRTA taxes. An amended complaint was subsequently filed on October 8, 1992. The government has counterclaimed, seeking to offset any recovery by plaintiff with FICA taxes that should have been paid on the two payments if RRTA taxes were not owed.

### PROCEDURAL HISTORY

Thereafter, on October 30, 1992, defendant filed a motion to dismiss the foregoing amended complaint for lack of subject matter jurisdiction or, alternatively, for failure to state a claim. In our earlier dispositive decision, *Chicago Milwaukee Corp. v. United States,* 29 Fed.Cl. 777 (1993), we held that this court lacked jurisdiction to entertain any part of plaintiff's claim for a refund of allegedly overpaid RRTA taxes. Accordingly, we dismissed the amended complaint.

The issue then before the court was— whether Treas.Reg. § 31.6402(a)–2(a)(2)(i) imposes a mandatory jurisdictional requirement, under I.R.C. § 7422(a),[2] on taxpayer's claim for a refund of both the employee

---

1. These administrative claims failed to include a statement that CMC Real Estate had either repaid the employees' share of the tax to the employees or had secured their consent to pursue the refund. *See* Treas.Reg. § 31.6402(a)–2(a)(2)(i) (1995).

2. Section 7422 states in relevant part:

*No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax ... until a claim for refund or credit has been duly filed with the Secretary according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.*
I.R.C. § 7422 (emphasis added).

portion as well as the employer portion of the tax. The relevant regulation states, in pertinent part, that:

> *Every claim filed* by an employer for refund or credit of employee tax under [the RRTA] ..., collected from an employee, *shall include* a statement that the employer has repaid the tax to such employee or has secured the written consent of such employee to allowance of the refund or credit.

Treas.Reg. § 31.6402(a)–2(a)(2)(i) (1995) (emphasis added). Based on the plain and obviously unambiguous language of the regulation, we held that such "compliance *antecedent to* the filing of a claim for refund of the employees' share of the tax *is mandatory.*" 29 Fed.Cl. at 781 (emphasis added). This we held because the regulation literally and explicitly provides when the "statement" *shall* be included, *i.e.,* "[when e]very claim [is] filed by an employer."

After holding that it was patently clear that this regulation was a mandatory condition precedent jurisdictional requirement on the maintenance of an action for the *employees'* share of RRTA taxes, the court went on to consider the further question of—whether an administrative claim for the employees' portion of the tax, in compliance with the above regulation, was *also* a mandatory jurisdictional *prerequisite to* the maintenance of an action for a refund of the *employer's* portion of the tax. Based on a review of the relevant regulations and the case law, we held that Treas.Reg. § 31.6402(a)–2(a)(2)(i) was clearly a jurisdictional precondition to the institution of a suit for the refund of the employer's portion of the RRTA tax as well as the employees' portion thereof.

On appeal, however, the United States Court of Appeals for the Federal Circuit disagreed and reversed. There, the court narrowly framed the issue for decision as follows: "whether Treas.Reg. § 31.6402(a)–2(a)(2) (1994) imposes a jurisdictional requirement under I.R.C. § 7422(a)." *Chicago Milwaukee Corp. v. United States,* 40 F.3d 373, 375 (Fed.Cir.1994). The court then began its analysis by noting that the regulation at issue (*i.e.,* § 31.6402(a)–2(a)(2)), notwithstanding the unambiguous initial sentence,

did "not specify when the employer must provide the certification. On its face, [that] regulation neither requires nor prohibits including the certification at the time of filing." *Id.* Next, the court turned to discuss I.R.C. § 7422(a), noting that the Court of Claims had construed this section as a notice provision designed to prevent surprise and give notice to the IRS. *See Burlington Northern, Inc. v. United States,* 231 Ct.Cl. 222, 684 F.2d 866, 868–69 (1982). Thus, the court held that as long as the government is given notice of the taxpayer's claim, an administrative claim is jurisdictionally adequate under § 7422(a). Accordingly, the court concluded that treating the regulatory certification requirement as jurisdictional would not advance the policies expressed in § 7422(a). *Chicago Milwaukee,* 40 F.3d at 375.

In support of this position, the Court of Appeals relied on *IBM v. United States,* 170 Ct.Cl. 357, 343 F.2d 914 (1965). In *IBM,* the taxpayer, a computer manufacturer, sued for the refund of certain excise taxes levied on computer sales contending that the specific computers at issue in the case were not covered by the tax. I.R.C. § 6416(a)(1)(C) provided that "no credit or refund of any overpayment" could be allowed unless the claimant established that it had repaid the tax to its vendees or had secured their written consent to maintain the claim. Because § 6416(a)(1) limited the actual refund, but did not condition the right to bring a claim, the *IBM* court held that the necessary written consents could be produced at any time prior to the ultimate award. *Id.* at 917–18. Finally, the *IBM* court noted that there were good reasons not to superimpose a requirement that the certification be made *prior* to filing as such a requirement would place a heavy burden on the claimant at a time when the refund was still only hypothetical. *Id.* at 918.

The Federal Circuit noted that the requirements under the statute at issue in *IBM* were similar, although not identical, to those in the regulations at issue before it. Like the *IBM* court, the Court of Appeals believed that there was no justification for imposing the certification burden on CMC at the time of the filing of an administrative claim. The

court held that the "basic thrust of the court's view in *IBM* controls here as well." *Chicago Milwaukee*, 40 F.3d at 376.

Lastly, the Federal Circuit relied on the views of the IRS on the certification requirement in support of its holding. The court cited, in this connection, an IRS General Counsel Memorandum ("GCM"), IRS GCM 38,786, in which the General Counsel stated that the certification requirement need not be met at the time of the filing of an administrative claim, so long as the claimant familiarized the IRS with the essence of his claim. *Id.* The appeals court noted that GCM "function[s] as a body of 'working law' *within the IRS.*" *Id.* (emphasis added) (quoting *Taxation with Representation Fund v. IRS*, 646 F.2d 666, 683 (D.C.Cir.1981)).

For these reasons, the Federal Circuit held that Treas.Reg. § 31.6402(a)–2(a)(2) was not jurisdictional. Therefore, the Court of Appeals, *Id.* at 376–77, instructed that:

> CMC may demonstrate compliance with [the certification requirement] after the Court of Federal Claims determines whether CMC is a railroad "employer." CMC may proceed with its suit for a refund of the employer and employee portions of RRTA taxes. Accordingly, this court does not reach whether an employer may claim a refund of the employer portion alone.

On remand, following the Federal Circuit's direction, this court dutifully allowed this matter to proceed to trial on the merits. As previously noted, a trial was held on March 18, 1996. The issues having been fully briefed by the parties, we now turn to address the substantive merits of the instant case.

## CONTENTIONS OF THE PARTIES

### I. *Plaintiff*

CMC makes three points in support of its position that it is entitled to a refund of the

RRTA taxes previously paid. First, CMC contends that, *at the time of the payments*, neither the Trustee nor CMC Real Estate were railroad "employer[s]" [3] under the RRTA. Because Milwaukee R.R. sold all of its operating Rail Assets in February 1985 and was declared by the ICC in April 1985 to no longer be a common carrier railroad, plaintiff warmly maintains that both the Trustee and CMC Real Estate were not "employers" *at the time of the payments* in October 1985 and September 1986.

Second, CMC alleges that, *at the time of the 1985 and 1986 payments*, 99.9% of the recipients thereof were no longer employees of Milwaukee R.R., the Trustee, or CMC Real Estate. Against this background, plaintiff argues that the RRTA tax only applies to individuals in the service of the employer *at the time of the payment*. Moreover, it contends that this statutory scheme is in contradistinction to the federal income tax withholding statute where Congress expressly extended applicability to former employees, by using the past and present tense in defining an "employer." I.R.C. § 3401(d). Therefore, avers CMC, since 99.9% of the payment recipients were not then employees, the RRTA taxes at issue were not legally due.

Third, plaintiff contends that the 1985 and 1986 payments were not "compensation" as defined by the RRTA and that, therefore, those payments were not subject to the tax. The RRTA, I.R.C. § 3231(e)(1), defines "compensation" as "any form of money remuneration paid to an individual for services rendered as an employee to [an] employer." Furthermore, CMC maintains that the payment must be in "direct exchange" for services performed, citing *Humble Oil & Refining Co. v. United States*, 194 Ct.Cl. 920, 442 F.2d 1362, 1368 (1971). Because the payment recipients had no clear and unconditional entitlement to receive any additional payment when the services were performed (*i.e.*, payment was contingent on the sale of

---

**3.** I.R.C. § 3231(a) defines an "employer" as, *inter alia*, "... any carrier (as defined in subsection (g)) and any company ... directly or indirectly owned or controlled by one or more such carriers ... which operates any equipment or facility or performs any service ... in connection with the transportation of passengers or property by railroad, or the receipt ... or handling of property transported by railroad, and any ... trustee ... when in the possession of the property or operating all or any part of the business of any such employer."

the Rail Assets at a sufficiently high price), plaintiff argues that the payments were not in direct exchange for services rendered and, thus, not compensation. In addition to the foregoing, CMC notes that these very same payments were ruled by the Eighth Circuit to not be compensation for the purposes of certain former employees' pension plan. *Bennett v. Soo Line R.R.*, 35 F.3d 334 (8th Cir.1994).

Finally, CMC contends that the government is not entitled to an offset for FICA taxes allegedly owed on the 1985 and 1986 payments. First, according to plaintiff, the contingent nature of the payments means that they were not "wages" subject to the FICA tax. Second, CMC alleges that defendant's claim is barred by the statute of limitations. I.R.C. § 6501(a). And, lastly, CMC maintains that the government cannot prove that any further withholding is allowable for the employees' share of the FICA tax for the years in question as it must to meet its burden on the offset.

## II. *Defendant*

In response, defendant strenuously argues that the 1985 and 1986 payments were unquestionably "compensation" paid by an "employer" to employees and, thus, were clearly subject to the RRTA tax. The government observes that the payments were made to the railroad's former employees who had operated the railroad from 1982 to 1985, during the Wage Reduction Agreement. Moreover, defendant notes that the Trustee had operated Milwaukee R.R. from 1977 to 1985 and that CMC Real Estate was the same entity as the railroad with its name changed. The government further contends that statutory interpretation should not turn solely on the verb tense used by Congress. Under plaintiff's hospitable view, suggests defendant, no taxes would be due on previously-earned wages paid *after* an employee left the railroad's employ, for instance, because of insufficient funds at the earlier time. In addition, avers the government, the reorganization plan treated the payments at issue as Class A wage claims for labor, deemed to have been paid by Milwaukee R.R. Finally, the government contends that, as a general rule, deferred wage payments are subject to employment taxes, citing *Otte v. United States*, 419 U.S. 43, 95 S.Ct. 247, 42 L.Ed.2d 212 (1974).

Second, defendant maintains that, if the 1985 and 1986 payments were not covered by the RRTA, then FICA taxes are due on those payments. Furthermore, defendant argues that the statute of limitations does not bar its claim for an offset. Under I.R.C. § 3503,[4] avers the government, it is entitled to offset the amount of FICA taxes owed from any refund of RRTA taxes. Additionally, the government contends that the doctrine of equitable recoupment allows it to offset any FICA taxes owed since such liability arose from the same transaction for which plaintiff seeks a refund. To allow plaintiff a windfall refund of RRTA taxes would be clearly inequitable, according to the government.

## DISCUSSION

### I. *CMC's Entitlement to a Tax Refund*

The RRTA imposes a tax on railroad employers and employees equal to a percentage of the compensation paid by the employer and received by the employee for services rendered by the employee to the employer. *See* I.R.C. §§ 3201(a) & (b), 3221(a) & (b). As a consequence, three issues are before the court:

(1) Were the disputed payments "compensation" under the RRTA?

(2) Were the payments made by an RRTA "employer?" and

(3) Were the payees "employees" pursuant to the RRTA?

Issues (2) and (3) depend on a further, preliminary legal issue, *i.e.*, under the RRTA, what is the correct point in time at which to evaluate the employment relationship to determine whether the payor and the payees

---

4. Section 3503 provides that—"Any tax paid under chapter 21 or 22 by a taxpayer with respect to any period with respect to which he is not liable to tax under such chapter shall be credited against the tax, if any, imposed by such other chapter upon the taxpayer, and the balance, if any, shall be refunded."

were an "employer" and "employees," respectively?

Because we need not reach issues (2) and (3) (as well as the fundamental legal issue embedded therein) unless the payments were "compensation," issue (1) is a threshold inquiry and the appropriate starting point of our analysis. If, and only if, the payments were "compensation," pursuant to the RRTA, will the court need to ascertain whether or not the payor and the payees were an "employer" and "employees," respectively.

### A. Were the Two Payments to the Railroad's Former Employees "Compensation" Under the RRTA?

■ I.R.C. § 3231(e)(1) defines "compensation" as "money remuneration paid to an individual for services rendered as an employee to one or more employers." *Accord* Treas.Reg. § 31.3231(e)–1(a)(1) (1986).[5] For the time being we assume that the payors and the payees were employers and employees, since we will need to address that issue later. Thus, the question becomes—Were the payments "money remuneration ... for services rendered?"

At bar, the two payments were made, pursuant to the Wage Reduction Agreement (WRA), to individuals who had agreed to

work (*i.e.,* render service) and did so work as employees at a previously reduced wage rate, in compensation for that reduction in wages. Clearly then, these payments were remuneration for such services rendered. And only those employees who *had rendered* service during the period covered by the WRA (1982–84) were entitled to payment, and, in fact, those employees were entitled to receive *up to the precise amount by which their wages had been previously reduced.*

Consistent with the foregoing is the fact that the regulations expressly provide that "[a]mounts paid to an employee for loss of earnings during an identifiable period as the result of the displacement of the employee to a less remunerative position" are to be included as compensation. Treas.Reg. § 31.3231(e)–1(b)(3).[6] Thus, when the Milwaukee employees entered into the WRA, it is clear beyond cavil that they were displaced to "a less remunerative position" (exactly 7% less remunerative).[7] In addition, the amounts paid by the Trustee and CMC Real Estate were paid pursuant to the WRA to make up for the "loss of earnings during an identifiable period," *i.e.,* while the WRA was in effect (1982–84). Consequently, not only do the payments at issue unambiguously satisfy the statutory definition of "compensation," but the regulations also make clear

---

5. Unless otherwise noted, all "Treas. Reg." citations in the "Discussion" section are to the 1986 regulations, which were also in effect in 1985.

6. Plaintiff argues that, as a result of the 1975 and 1983 amendments to the RRTA, *see* Pub.L. No. 94–93, § 204, 89 Stat. 461, 466 (1975); Pub.L. No. 98–76, 97 Stat. 411, 424–426 (1983), which, *inter alia,* eliminated a phrase providing that compensation included payments for "time lost" from the statutory definition, this regulation was no longer supported by the statute. However, the legislative history of these amendments, *see Atchison, Topeka & Santa Fe Ry. v. United States,* 628 F.Supp. 1431 (D.Kan.1986) (delineating the legislative history of the 1975 amendment), reveals that the 1975 amendment was intended solely to clarify that the RRTA tax was assessed to the extent and at the rate applicable *when paid,* rather than when earned, as had been the case prior to 1975, *see* Rev.Rul. 75–266, 1975–2 Cum.Bul. 408, and that the 1983 amendment to the definition of compensation was a further "technical and conforming amendment" designed to accommodate the 1975 change in the law from an "earned basis" to a "paid basis." H.Report 98–30 (1983), 1983 U.S.C.C.A.N. 729, 823. Nothing in the legislative history indicates

that Congress intended to change the substantive definition of "compensation." Rather, Congress sought to make compensation taxable to the extent and at the rate applicable when paid. Therefore, *Congress deleted certain provisions providing that compensation for time lost is to be deemed earned in the month when the time is lost,* as when the compensation was earned was no longer relevant to determining the extent or rate at which compensation was taxable. Indeed, in late 1994, the Treasury Department specifically rejected the notion that the amendments to the definition of "compensation" made compensation for time lost non-taxable in T.D. 8582, 1995–1 Cum.Bul. 197, 188.

7. Plaintiff contends that the employees were not "displaced" to another "position" because they continued in the same occupation performing the same duties as had been performed prior to the WRA. Plaintiff cites no authority for the proposition that the term "position" should be read so narrowly. As the court sees it, based on the regulation's plain language, a wage reduction *is* a displacement to a less remunerative position.

that these payments were, as a matter of law, "compensation."

Moreover, a temporary regulation, published in the Federal Register on January 7, 1985, 50 Fed.Reg. 577 (1985), and published in the Code of Federal Regulations, 26 C.F.R. (Temp.Treas.Reg.) § 31.3231(e)–2T (1986), is also instructive:

> "[C]ompensation" include[s] *any benefit* provided to or on behalf of an employee ... if the employment agreement provides, either expressly or impliedly, for the inclusion of the benefit as part of the employee's remuneration ... [unless] it is reasonable to assume that the employee will be able to exclude such benefit from income under section 117 or 132.

(emphasis added). This regulation demonstrates that the term "compensation" is relatively broad. Moreover, it is directly applicable to the facts at bar in that the WRA, undoubtedly part of the employment agreement, expressly provided that the employees would receive the benefit of the lump-sum payments, if conditions permitted, as part of a total package of remuneration. *Cf. Central Illinois Public Service Co. v. United States,* 435 U.S. 21, 28–29, 98 S.Ct. 917, 921, 55 L.Ed.2d 82 (1978) (FICA "wages" include the "total package of remuneration designed to attract and hold the employee"). Since the payments at issue were not excludable from income, application of this regulation, published at the time of both the 1985 and 1986 payments, inescapably leads to the conclusion that the payments were "compensation" under I.R.C. § 3231(e).

Plaintiff argues that the contingent character of the payments precludes them from meeting the definition of "compensation." However, nothing in the statutory definition or the regulations supports this argument. Simply put, the contingent nature of the payments does not and cannot change the incontrovertible fact that they were paid in exchange for *services rendered* during the WRA period, and they were certainly "money remuneration." Plaintiff, in relying on *Humble Oil & Refining Co.,* 442 F.2d at 1368, states that, to be considered compensation, the payments must have been in "direct exchange" for services rendered. Plaintiff

further avers that, because of the contingent character of the payments at issue, they were, therefore, not in "direct exchange" for services rendered.

First, *Humble* involved income tax withholding rather than the RRTA withholding. Moreover, even assuming the identity between FICA "wages" in I.R.C. § 3402 and "compensation" under the RRTA, the payments that the Court of Claims held not to constitute wages were reimbursements (or advances) for meals and lodging consumed while moving to a new place of employment for the benefit of the employer. That circumstance is a significant fact distinction from the clear and unambiguous facts at bar. In that case, the court found that "[n]o service was performed by plaintiff's employees in order to obtain these reimbursements...." *Id.* at 1365. At bar, the payments were clearly in "direct exchange" *for services rendered.* They served no other purpose of the employer. *Cf. Stubbs, Overbeck & Assocs. v. United States,* 445 F.2d 1142, 1150 (5th Cir.1971) ("where the withholding statute is involved, the matter should be viewed from the standpoint of the employer's purpose in making the payment"), *cited in General Elevator Corp. v. United States,* 20 Cl.Ct. 345, 351–52 (1990). The payments at bar were intended to induce the employees to perform services (at a reduced wage rate), and, as stated above, only those who actually performed services were entitled to obtain the payments.

Finally, plaintiff relies on the Eighth Circuit's ruling in *Bennett v. Soo Line R.R. Co.,* 35 F.3d 334 (8th Cir.1994). In that case, the court upheld the trial court's determination that the very same payments at issue in this case were not "Milwaukee compensation" for the purposes of pension-related terms in the Asset Purchase Agreement (APA). *See* JX 2 at 68–69, Jt.Stip.Ex. B, ¶ 28(a) & (b); JX 10 at 34–35. Obviously, another court's construction of a clause in a private contract is not obligatory on this court's interpretation of a statute. Moreover, the Court of Appeals specifically referred to the payments as "retroactive *wage* payments." 35 F.3d at 336 (emphasis added). Thus, even the *Bennett* court recognized, at least implicitly, that

these payments were compensation for services rendered by the employees during the WRA. Rather, the court's decision turned on the meaning of the term "Milwaukee" modifying "compensation." The court held that the APA incorporated the definition of "compensation" in the Milwaukee R.R. pension plan, which the court further held was limited by the word "Milwaukee" to the years 1982–1984. *Id.* at 337. I.R.C. § 3231(e) contains no such limitation.

Because the 1985 and 1986 payments were made pursuant to the WRA, the sole purpose of which was to induce the employees to continue rendering service to the railroad, it inescapably follows that the payments were "money remuneration … for services rendered." Thus, we hold that the payments were taxable under the RRTA as "compensation" if paid by an "employer" to "employees," which leads to the next issue the court must address.

B. *At What Point In Time Must The Court Evaluate The Employer/Employee Relationship?*

I.R.C. § 3201(a) & (b) (employee share) imposes on the employee an employment tax equal to a "percentage of the compensation received during any calendar year by such employee for services rendered by such employee," and I.R.C. § 3221(a) & (b) (employer share) similarly imposes a payroll tax on the employer equal to a "percentage of compensation paid during any calendar year by such employer for services rendered to such employer." Thus, at first blush, there are two possible readings of the statute on the question of when one should evaluate employer/employee status to determine the applicability of the RRTA: (a) when the compensation was paid (CMC's contention); and (b) when the services for which the payee is being compensated were rendered.

Plaintiff focuses narrowly on the exclusive use of the present tense in the statutory definitions of an employee "in the service" of

a railroad employer. *See* I.R.C. § 3231(b) & (d). CMC argues that the exclusive use of the present tense in selected provisions of the RRTA indicates that Congress intended that employment status under the act should be determined *at the time of payment.* In support of this contention, plaintiff cites to *Otte,* wherein the Supreme Court held that the use of both the present and past tenses of "perform" in defining an "employer" "plainly reveals that a continuing employment relationship is not a prerequisite for a payment's qualification as 'wages' [under federal income tax withholding and FICA]." 419 U.S. at 49–50, 95 S.Ct. at 253.[8]

However, the fact that the RRTA uses the present tense in certain definitional provisions does not really answer (but rather it begs) the dispositive question. As the court views the operative facts, most, if not all, of the relevant events are in the past. Surely plaintiff does not contend that the court should look at the issue of the existence of an employer/employee relationship on the day it issues its decision in this case to determine the applicability of the tax law. Clearly, then, the court is required to pick some point in time in the past at which to make such an evaluation.

Our analysis convinces us that the statutory language of the RRTA supports reading (b) above, to wit, that the employer/employee status for imposing the tax should be determined *when the services are rendered.* First, the tax is imposed on "compensation," which is defined as "money remuneration paid to an *individual* for services rendered as an *employee* to one or more *employers.*" I.R.C. § 3231(e) (emphasis added). The juxtaposition of the term "individual" when discussing payment and the terms "employee" and "employer" in relation to the rendering of services makes it clear beyond cavil that Congress intended that the time at which the services were rendered would be the one at which the determination of employer/employ-

---

8. The Court, in *Otte,* most certainly did not say that the use of both past and present verb tenses was the only way that Congress might express its intent that taxes would be owed for wages paid after the employment relationship had ended. Therefore, we do not view it as significant that

Congress did not choose this manner of expressing its intent in the RRTA, especially since the RRTA predates both the withholding provisions of the Internal Revenue Code and, of course, the *Otte* decision.

458

ee status should occur. This distinction is also explicated in the applicable regulations, which define compensation as "all remuneration ... which is earned by an *individual* for services rendered as an *employee* to an *employer.*" Treas.Reg. § 31.3231(e)–1(a)(1) (emphasis added).

Second, as noted above, the amount of the tax (both the employees' and employer's portions) is equal to a specified percentage of "compensation received [or paid in the case of the employer] ... for services rendered by such employee [or to such employer]." I.R.C. §§ 3201 & 3221. Again, the statutory language significantly emphasizes the employment relationship in connection with the rendering of service by an employee to his employer. Moreover, the regulations issued under I.R.C. § 3201 (employee tax) state that "the employee tax ... is measured by the amount of compensation paid to an *individual for services rendered as an employee to [an] employer[ ]*." Treas.Reg. § 31.3201–1 (emphasis added). This provision removes any doubt in the statutory language that the existence of the employment relationship must be evaluated and determined as of the time the services are rendered and the compensation earned. Thus, the foregoing statutory and regulatory language plainly and amply demonstrates a congressional intent that *the time when the services,* for which the compensation is paid, *were rendered* is the correct time to ascertain whether or not the payor and payee are in an employer and employee relationship, respectively, within the purview of the RRTA.

Under plaintiff's hospitable reading of the statute, an employee who quits his job on Wednesday (further obviating the employee/employer relationship) and thereafter picks up his final paycheck on Monday would not be subject to the tax even though he was

undoubtedly a railroad employee when he *earned* his pay. It strains credulity to think that Congress could have intended such an absurd result,[9] and the relevant regulations support the view that Congress did not. Treas.Reg. § 31.3231(e)–1(a)(1) provides that "payroll" payments to an individual are presumed to be "compensation for services rendered by such individual as an employee of the employer."[10] Thus, under this regulation, a final paycheck, after the termination of an employment relationship, is presumed to be "compensation" for services rendered by the employee and, thus, subject to the RRTA.

Indeed, the legislative history of the statute shows that Congress did not intend plaintiff's avowed reading. Originally enacted as the "Carriers Taxing Act of 1937," Pub.L. No. 75–174, 50 Stat. 435, the RRTA repealed and replaced an earlier and similar tax act. In the report of the House Ways and Means Committee recommending passage of the bill, it was noted that the 1937 Act changed the definition of "compensation" (versus the earlier provision) to "make it clear that what is significant is that the compensation has been *earned* by the employee, not that it has been actually received by him." H.Report No. 75–1071 (1937) (emphasis added) (incorporated into S.Report No. 75–818 (1937)). If Congress thought that the *fact* of earning the compensation by an employee from an employer was significant, it follows *a fortiori* that it believed that the time at which said compensation was *earned,* as a fact, was also significant. It further follows, therefore, that Congress intended that the correct time to determine whether the payor and payee were an "employer" and "employee," respectively, under the act is the time at which the compensation is earned.

---

9. Under plaintiff's proposed interpretation, taxpayers might be induced to engage in a variety of schemes to avoid RRTA taxation. For example, a railroad facing insolvency might choose to delay wage payments until after it ceased operations in order to avoid RRTA taxes. On plaintiff's absurd and overly strict hypothesis, a taxpayer could even fire its employees every Friday at 5 p.m., issue paychecks at 5:15, then rehire its employees the following Monday morning, and claim that it was not subject to the RRTA since,

at the time of payment, no employment relationship existed between the payor and the payees.

10. In T.D. 8582, 1995–1 Cum.Bul. 187, 188, the Treasury Department specifically rejected the view that Congress intended by the 1983 amendment, which deleted similar language from the RRTA, to remove this presumption. *See* note 6, *supra.*

Moreover, prior to the RRTA's amendment in 1975, as reflected in Rev.Rul. 75–266, 1975–2 Cum.Bul. 408, compensation was subject to RRTA taxes *to the extent and at the rate applicable* when it was earned. *Atchison*, 628 F.Supp. at 1433. Under this regime, the entire focus of the statute was on when the compensation was earned (*i.e.*, when the services were rendered). In 1975, in response to Rev.Rul. 75–266, Congress amended the RRTA so that RRTA taxes would be on an "as paid" basis, rather than an "as earned" basis, meaning *only* that the tax rate and annual wage limitation applicable would be those in force when the wages were paid and the taxes withheld. Pub.L. No. 94–93, 89 Stat. 466 (1975). *See also Atchison*, 628 F.Supp. at 1435–37. This change was designed to ease the bookkeeping and administrative burdens on railroad employers by, for example, eliminating any need to apportion wages between those earned before and after a rate increase. *Id.* Thus, the 1975 amendment of the RRTA affected only the *tax rate and extent* applicable to RRTA compensation, but not the underlying liability under the RRTA. Nothing in the legislative history of this amendment indicates that Congress intended that the determination of employer and employee status under the RRTA would be made at any time other than when the compensation was earned, as had been manifestly provided in the statutory language and regulations up to that point. The same is true of the 1983 amendments to the RRTA. Pub.L. No. 98–76, 97 Stat. 411 (1983). *See also* 1983 U.S.C.C.A.N. 729 (House Reports).

Moreover, FICA and the RRTA are clearly complementary taxing statutes for essentially parallel retirement/disability systems (*i.e.*, Social Security and Railroad Retirement), where remuneration for employment (or services rendered) is taxable under one of the two systems, but not both. This scheme is effected by I.R.C. § 3121(b)(9), which exempts from the definition of "employment," under FICA, "service performed by an individual as an employee ... as defined in section 3231 [of the RRTA.]" Because FICA taxes are only imposed on "wages ... with respect to employment," I.R.C. §§ 3101(a) & (b), 3111(a) & (b), the exclusion of work as a railroad employee from "employment" means that wages for that railroad work are not taxed under FICA. The obvious reason is because those wages are taxed under the RRTA.

The language of I.R.C. § 3121(b)(9), *i.e.*, "service *performed* ... *as an employee* [under the RRTA]" (emphasis added), makes clear that at least for the purposes of FICA the employment relationship under the RRTA must be evaluated at the time the services were "performed." Given this premise, the same must also be true for the purposes of the RRTA, else a discontinuity would exist between the two taxing statutes. For example, if a railroad employee left the employ of his railroad employer and thereafter received a paycheck, under plaintiff's interpretation of the RRTA, those wages would not be subject to the RRTA taxes. However, pursuant to the plain language of I.R.C. § 3121(b)(9), those same wages would also not be taxable under FICA because the services were *"performed* ... as an employee" as defined in I.R.C. § 3231(b) ("any individual in the service of one or more [railroad] employers for compensation"). Thus, on plaintiff's hypothesis, what was most certainly remuneration for employment (a paycheck for wages) would escape taxation under both statutes. In setting up these complementary and parallel statutory schemes, Congress most certainly did not intend such a result. The conclusion therefore follows that under both FICA and the RRTA the railroad employment relationship must be evaluated *at the time the services were performed and the compensation earned.*

Finally, we note that the legislative history of the RRTA indicates that from the outset it has been the intent of Congress that the tax shall be levied on compensation paid *for services rendered* as an employee to an employer, notwithstanding the parties' relationship at the time of eventual payment. The regulations confirm and give effect to this congressional intent. The court, therefore, looks to *the time at which the services were rendered* to determine whether or not CMC's predecessors and the payment recipients

were an "employer" and "employees," respectively, for the purposes of the RRTA.[11]

### C. On The Undisputed Facts, Milwaukee R.R. And The Trustee Were Employers At The Time The Services Were Rendered.

 Together, I.R.C. § 3231(a) and (g) define an "employer" as any "express carrier, sleeping car carrier, or rail carrier providing transportation subject to [the jurisdiction of the ICC]," § 3231(g), or any "trustee ... when in possession of the property or operating all or any part of the business of any such employer," § 3231(a). Milwaukee R.R. was undoubtedly a railroad carrier until its Rail Assets were transferred to Soo Line under the APA *in 1985.* Prior to that time, Milwaukee R.R. continued to operate as a railroad, *at least until the beginning of 1985,* which embraced the entire wage reduction period, *i.e.,* 1982 through 1984. In addition, upon appointment in 1978 by the reorganization court, the Trustee became an employer and continued in such capacity at least until the beginning of 1985 because he was "in possession of the property or operating all or any part of the business of" a rail carrier employer. I.R.C. § 3231(a).

"On April 2, 1985, the ICC formally recognized that '[Milwaukee R.R.] is no longer operating as a common carrier railroad'...." Jt.Stip. ¶ 33. Previously, on February 19, 1985, the reorganization court approved the APA, under which Milwaukee was to transfer all of its Rail Assets to Soo Line. Furthermore, on November 25, 1985, the Trustee transferred all title and interest in Milwaukee R.R.'s property back to Milwaukee R.R., which was renamed CMC Real Estate. Therefore, from the appointment of the Trustee until the Rail Assets of Milwaukee R.R. were transferred to Soo Line, the Trustee was in possession of the property of, and Milwaukee R.R. was, a rail carrier subject to ICC jurisdiction. *See* I.R.C. § 3231(a) & (g).

Accordingly, we hold that from 1982 to the end of 1984, the time during which the payees performed services at a reduced wage, entitling them to receive the 1985 and 1986 payments, both Milwaukee R.R. and the Trustee were employers within the contemplation of the RRTA. Counsel for CMC conceded as much at trial. Tr. 53, 54.

### D. On The Undisputed Facts, The Payees Were Employees At The Time The Services Were Rendered.

 I.R.C. § 3231(b) defines an "employee" as "any individual in the service of one or more employers for compensation." We have already found that Milwaukee R.R. was an employer from 1982 through 1984. Furthermore, it is patently clear and indisputable that the payees were in the service of Milwaukee R.R. for compensation, pursuant to the WRA, during that time frame. Therefore, on this record it is irrefutable that the recipients of the two payments at issue in this case were "employees" under the RRTA when the services were rendered and in connection with the receipt of the payments therefor, and we so hold.

Accordingly, we hold that CMC is *not* entitled to a refund of RRTA taxes because they were properly paid on compensation for services rendered to an employer by its employees between 1982 and 1984.

### E. A Final Note

 As a last ditch, catch-all argument, CMC contends that the statutory obligations of the RRTA are imprecise and speculative. As such, plaintiff maintains that this ambiguous statute must be construed in favor of the taxpayer. Accordingly, CMC alleges that it is entitled to a refund of the RRTA taxes at issue before the court because the RRTA and associated regulations did not give it adequate notice of its withholding obligations. The court does not disagree with plaintiff that, as a general rule, "if doubt exists as to the construction of a taxing statute, the doubt should be resolved in favor of the

---

11. The court notes that even if it were to look at the time at which the payments were made to the former Milwaukee R.R. employees, it still *might* find that the Trustee and, later, CMC Real Estate, were employers because they retained ownership of five rail lines, which were leased to others through 1986.

taxpayer." *Xerox Corp. v. United States,* 41 F.3d 647, 658 (Fed.Cir.1994) (internal quotation marks and citations omitted). However, in this case, we simply find no reasonable doubt as to the proper interpretation and application of the RRTA based on, *inter alia,* "the clear import of the language used." *Gould v. Gould,* 245 U.S. 151, 153, 38 S.Ct. 53, 53, 62 L.Ed. 211 (1917). *See also Xerox,* 41 F.3d at 658 ("the starting point is the words of the statute").

■ In connection with this argument, CMC relies heavily on the *Central Illinois* line of cases. *See Central Ill. Public Service Co. v. United States,* 435 U.S. 21, 98 S.Ct. 917, 55 L.Ed.2d 82 (1978); *McGraw–Hill, Inc. v. United States,* 224 Ct.Cl. 354, 623 F.2d 700 (1980); *Hotel Conquistador, Inc. v. United States,* 220 Ct.Cl. 20, 597 F.2d 1348 (1979); *General Elevator Corp. v. United States,* 20 Cl.Ct. 345 (1990). *See also Sims v. United States,* 756 F.Supp. 1048 (M.D.Tenn. 1991); *Western Reserve Academy v. United States,* 619 F.Supp. 394 (N.D.Ohio 1985), *aff'd* 801 F.2d 250 (6th Cir.1986) (adopting the trial court's opinion). These cases generally stand for the proposition that "[b]ecause the employer is in a secondary position as to liability for any tax of the employee, ... the employer's obligation to withhold [must] be precise and not speculative." *Central Ill.,* 435 U.S. at 31, 98 S.Ct. at 923. Therefore, where the employer, viewing the statute and contemporaneous regulations, could not "reasonably suspect that a withholding obligation existed," that employer is entitled to a refund of withholding taxes assessed against it by the IRS. For the reasons explicated below, we hold that the *Central Illinois* line of precedent is inapposite to the facts at bar. Furthermore, on the facts at bar, we find that based on the totality of the applicable law in 1985 and 1986, plaintiff should have "reasonably suspect[ed]," and in fact did so

suspect, that the RRTA was applicable to the payments at issue here.

First, it bears mentioning that none of the cited cases deals with the RRTA, which is at the center of this dispute. Second, and perhaps most significantly, in every single one of the cases cited by plaintiff, the taxpayer *failed* to withhold taxes, was subsequently assessed by the IRS for a deficiency, paid the assessed withholding taxes, and then brought suit for a refund.[12] At bar, of course, plaintiff's predecessors (*i.e.,* CMC Real Estate and the Trustee) *voluntarily withheld and paid* the RRTA taxes, *sua sponte,* without any prodding from the government. Given this situation, a significant factual distinction from the cited cases, the court is hardpressed to take plaintiff's argument, that it did not have adequate notice of "what [it was] supposed to do and why," seriously. *McGraw–Hill,* 623 F.2d at 705. Plaintiff did in fact do, *sua sponte,* what it was supposed to do.

Apparently, it did not occur to plaintiff until several years after the first payment (administrative claims were filed on April 22, 1988), probably on review by learned counsel, that it might make a colorable argument that RRTA taxes were not owed. In this "offensive" posture, as opposed to what we might call the "defensive" posture of the taxpayers in *Central Illinois* and its progeny, where taxpayers were in effect defending against an assessment of deficiency by the IRS, plaintiff may not rely on what the Claims Court has termed "the notice requirement," *General Elevator,* 20 Cl.Ct. at 352, but must instead show that, under the law as applied to the facts of the case, the taxes were *incorrectly* paid. "Notice" is simply not an issue in this case, on these facts.

Third, the principle espoused in the *Central Illinois* line of cases applies expressly to the employer's "withholding obligation" for

---

**12.** *Hotel Conquistador* involved the unusual situation where the employer had paid FICA taxes on meals provided to its employees, valuing those meals at 45 cents apiece. The IRS contended that the meals were worth $1.25 each and assessed a deficiency against the taxpayer. However, because plaintiff had not filed a timely refund claim for the taxes paid on the 45 cents, only the assessed deficiency on the excess of $1.25 over 45 cents was at issue in the substantive discussion. Indeed, the Court of Claims held that "the employer should not be *assessed* for not *withholding* unless" its obligation to do so was precise and not speculative. 597 F.2d at 1354 (emphasis added). This case also involved the Federal Unemployment Tax Act (FUTA) which is imposed solely on the employer and, therefore, does not involve any withholding from the employees.

which it is "in a secondary position as to liability." 435 U.S. at 31–32, 98 S.Ct. at 923. Indeed, *Central Illinois* itself involved only federal income tax withholding, for which there is no employer portion, and was specifically premised on the employer's secondary liability for withholding taxes. At bar, plaintiff was not held secondarily liable for its employees' taxes. Rather, the employees paid their own taxes through withholding. As was intimated earlier, it is not yet even certain whether plaintiff on this record is entitled to bring a claim for the employees' share of the RRTA taxes, and, at any rate, plaintiff would be required to remit any refund of the employees' taxes to them. As to the employer share of the RRTA taxes, plaintiff was in a position of primary liability and, therefore, there was no *withholding* obligation. As a consequence, *Central Illinois* is inapplicable with respect to the employer portion.

Some later cases have applied the *Central Illinois* principle beyond the income tax withholding context to FICA taxes, for which there is an employer and employee share. *Hotel Conquistador,* 597 F.2d 1348; *General Elevator,* 20 Cl.Ct. 345; *Western Reserve,* 619 F.Supp. 394. Even in these cases, however, the courts have emphasized that "the employer should not be assessed for *not withholding* unless" the *withholding obligations* were precise and not speculative. *See, e.g., Hotel Conquistador,* 597 F.2d at 1354 (emphasis added). Citations to the *Central Illinois* case have been consistent with this emphasis on the employer's withholding obligation. Therefore, even if the court were convinced (and it is not) that plaintiff did not have clear and precise notice of its *withholding obligations,* we still might find that plaintiff was liable for the employer portion of the RRTA, as "the notice requirement" only applies to withholding obligations.

The sole purpose of this extended discussion has been to squarely meet and refute each of plaintiff's arguments. For the reasons stated above, the cases cited by plaintiff are inapposite to the facts at bar. Furthermore, the simple fact of the matter is that, as noted throughout this opinion, the RRTA and the regulations applicable in 1985 and 1986

gave ample notice to reasonably suspect that RRTA taxes were owed on the payments at issue. Indeed, as we have held, plaintiff correctly withheld and paid all the applicable taxes, thus the refund posture of this case.

## II. *The Government's Entitlement to an Offset*

Given our adverse resolution of plaintiff's prima facie case, holding that CMC is *not* entitled to recovery of any of the RRTA taxes it paid, we need not address defendant's counterclaim for an offset as that issue is now moot. Stated differently, there is nothing to offset.

## III. *Evidentiary Issues*

At trial, the court reserved ruling on the admissibility of Defendant's Exhibits 8–12, for identification. We now address those documents. Defendant's Exhibit 8 is a letter (with attachment) from CMC Real Estate's Assistant Manager of Taxes, R.M. Benton, to the Railroad Retirement Board. Plaintiff objects to the admissibility of this letter, as well as to the other exhibits objected to, on the grounds of relevancy and hearsay. JX 1 at 10–14. The government, in response, contends that this document is relevant because it contains CMC Real Estate's admission that the 1985 and 1986 payments to former railroad employees were subject to RRTA taxes, *id.* at 10, and, as an admission of a party, defendant contends that this out-of-court statement is, by definition, not hearsay. *See* Fed.R.Evid. 801(d)(2). Whether or not the payments at issue in this case were subject to the RRTA is a question of law, not of fact, which is the province of the court to decide. Because defendant does not proffer the proposed document to prove any underlying facts, but merely an ultimate legal conclusion, said exhibit is not probative on any relevant issue of fact. Accordingly, on this proffer, the court denies defendant's motion to admit Defendant's Exhibit 8.

As to Defendant's Exhibit 9, a motion to dismiss or for summary judgment filed by CMC Real Estate in the reorganization court, the government argues that said memorandum is relevant to show that the sale of Milwaukee R.R.'s Rail Assets was not con-

summated until after the September 1986 payment. JX 1 at 11. Given our resolution of the fundamental question of statutory interpretation in this case, that is, that the employment relationship of the payor and the payee must be evaluated at the time the services were rendered (and the compensation earned), it is irrelevant whether the consummation date of the sale of the Rail Assets was in early 1985, as contended by plaintiff, or after September 1986. Therefore, we also sustain the objections to admit Defendant's Exhibit 9 into evidence on the grounds that it is not relevant.

Finally, defendant maintains that Defendant's Exhibits 10–12, for identification, are relevant to establish that a unit of plaintiff was an RRTA "employer" at all relevant times (including 1985 and 1986). JX 1 at 12–14. Again, because we hold that the determination of "employer" status in this case must be made at the time the services were rendered (*i.e.*, 1982–84), the proffered exhibits are irrelevant to that issue.[13] Consequently, on this premise, defendant's motion to admit Defendant's Exhibits 10–12 for identification is hereby denied.[14]

## CONCLUSION

Plaintiff is incorrect as a matter of law in its fundamental premise that the time of the payment is the correct time for determining the employer/employee relationship under the RRTA. We hold that the court must look to the time at which the services were performed (and the compensation earned) to determine whether the taxpayer was an employer and whether the payees were employees pursuant and subject to the RRTA. On the undisputed facts before the court, both the Trustee and Milwaukee R.R. were clearly employers during January 1, 1982 to January 1, 1985. Similarly, the payees were undoubtedly employees of Milwaukee R.R.

13. Defendant has filed, on April 16, 1996, a Motion For Leave To Submit Additional Argument on the admissibility of these exhibits, wherein defendant admits that Defendant's Exhibits 10–12 are irrelevant on this very basis. Consequently, defendant's motion for leave must be denied as moot.

14. Defendant objected to the admissibility of Plaintiff's Exhibits 1 through 5, for identification,

during that same time period. Because the 1985 and 1986 payments were compensation, as statutorily defined, for services rendered in 1982, 1983, and 1984 by employees to their employer, the payments were subject to taxation under the RRTA. As the taxes at issue in this refund suit were correctly paid, CMC has failed to prove that it is entitled to a refund. Since no refund is legally due, there is nothing to offset, and that issue is, therefore, moot. Accordingly, the Clerk shall enter judgment dismissing this case. In addition, Defendant's Motion For Leave To Submit Additional Argument is hereby denied. *See* note 13, *supra.* Costs against the plaintiff to the defendant.

IT IS SO ORDERED.

which objections were sustained without prejudice to plaintiff's right to renew if plaintiff prevails on the substantive liability issue (*i.e.*, that it is not subject to the tax and is entitled to a refund) because those exhibits had been proffered solely to show the precise amount of RRTA tax paid and were, thus, premature. Tr. 13, 21, 35.