MAYER, Chief Judge.
 

 Chicago Milwaukee Corporation appeals the United States Court of Federal Claims’ judgment,
 
 Chicago Milwaukee Corp. v. United States,
 
 35 Fed. Cl. 447 (1996), denying the company a tax refund. We affirm.
 

 Background
 

 The parties stipulate the facts. Chicago Milwaukee succeeds the Chicago, Milwaukee, St. Paul and Pacific Railroad (Railroad), a former carrier subject to the jurisdiction of the Interstate Commerce Commission.
 
 See
 
 49 U.S.C. § 10501 (1982). Facing insolvency in late 1977, the Railroad petitioned the United States District Court for the Northern District of Illinois to reorganize under the Bankruptcy Act of 1898.
 
 See
 
 11 U.S.C. § 205 (1976) (repealed 1978). The court appointed a trustee (Trustee) for the Railroad, who eventually determined that the Railroad’s survival required reducing the employees’ wages temporarily. On January 29, 1982, the reorganization court approved a wage reduction agreement among the Trustee (on behalf of the Railroad) and four labor organizations (on behalf of the employees). The reduction agreement reduced all employees’ gross taxable earnings by seven percent from January 1, 1982, until December 31, 1984. If the Trustee could sell the Railroad’s operating lines for a sufficient price, the employees affected by the reduction agreement would receive from the Railroad’s estate up to the amount of the reduction. In particular, the reduction agreement provided:
 

 In the event of the consummation of a .transaction for the sale or merger of all or substantially all of the railroad lines ..., employees who had wages reduced under this agreement ... shall be entitled to the return of up to the amount by which wages were reduced [as determined by a formula].... [But if] the total consideration does not exceed the ICC book value ... no employee shall be entitled to the return of any amount by which wages were reduced under this agreement.
 

 On April 6, 1984, the Trustee entered into an asset purchase agreement with the Soo Line Railroad Company and its corporate affiliate, SLRCO, Inc. (together Soo),’ selling substantially all of the Railroad’s rail lines for $148 million plus the assumption of certain liabilities totaling over $300 million. Both parties agreed to adjust this price to account for pre-closing changes in the assets’ net value. Writing that “upon consummation of the transactions contemplated by the [asset purchase agreement], all common carrier obligations of the Trustee and [the Railroad will] be assumed by Soo,” the reorganization court approved the purchase agreement on February 19,1985, when the Railroad ceased operating as a railroad. Virtually all of the Railroad’s ■ employees subsequently began working for Soo, and the Interstate Commerce Commission formally recognized on April 2, 1985, that the Railroad was “no longer operating as a common carrier railroad.” However, the Railroad’s estate remained liable for the possible repayment of the wage reduction.
 

 Individuals subject to the reduction agreement received repayment of their wage reduction ultimately, but not immediately. The Trustee and Soo disagreed over the adjusted
 
 *1114
 
 sale price, which likely delayed full repayment of the wage reduction. In the fall of 1985, the Trustee requested that Soo specify in writing the total downward adjustment it sought. Soo responded in a letter dated October 4, 1985, that it did not seek to reduce the purchase price by more than $50 million. The Trustee determined that even with a $50 million reduction, he could return at least sixty-six percent of the wage reduction. In mid-October of 1985, he paid the workers sixty-six percent of the total wage reduction. On September 12,1986, the reorganization court approved a settlement agreement ending the dispute over the adjusted price for the Railroad’s assets. CMC Real Estate, the Railroad’s successor, repaid the remainder of the wage reduction later that month.
 

 Individuals receiving the payments did not “take home” the full amount of the wage reduction. Taxes were withheld. Among those taxes was the Railroad Retirement Tax Act’s employee tax, I.R.C. § 3201 (1982 & Supp. II 1984). The Railroad Retirement Tax Act (Tax Act),
 
 id.
 
 §§ 3201-3232, is the railroad industry’s analogue to the Social Security Tax Act: it imposes a payroll tax on employers and employees. Revenues from the Tax Act pay pensions and other benefits.
 
 See
 
 Railroad Retirement Act of 1974, 45 U.S.C. § 231 (1994) (pension program); Railroad Unemployment Insurance Act,
 
 id.
 
 §§ 351-367. On October 18,1985, the Trustee paid employer and employee Tax Act taxes to the Internal Revenue Service. He filed a corresponding tax return with the IRS for 1985 on April 17, 1986. CMC Real Estate likewise remitted the taxes to the IRS on October 3, 1986, and filed a return for 1986 on January 28, 1987.
 

 In April of 1988, CMC Real Estate timely filed administrative claims with the IRS for the refund of the Tax Act taxes that it and the Trustee paid in 1986 and 1985, respectively. The IRS did not act on CMC Real Estate’s claims. So, on July 9, 1992, Chicago Milwaukee Corp., CMC Real Estate’s successor, filed this suit in the Court of Federal Claims. The court dismissed the case for lack of jurisdiction.
 
 See
 
 29 Fed.Cl. 777 (1993);
 
 see
 
 35 Fed.Cl. at 451-53 (summarizing procedural history). Chicago Milwaukee appealed the dismissal, which this court reversed.
 
 See
 
 40 F.3d 373, 375 (Fed.Cir.1994). On remand, the trial court held that the repayment of the wage reduction constituted “compensation” from an “employer” under the Tax Act; thus, it denied Chicago Milwaukee a refund. Chicago Milwaukee appeals.
 

 Discussion
 

 Section 3221 of the Internal Revenue Code (Supp. II 1984) “imposed on every
 
 employer
 
 an excise tax ... equal to [a] percentage of
 
 compensation
 
 paid during any calendar year by such employer for services rendered to such employer” (emphasis added). This appeal boils down to two primary issues: (1) whether the phrase “paid ... by such employer” covers the repayment of the wage reduction and (2) whether the repayment constituted compensation.
 

 Resolving the first issue requires addressing the meaning of “employer.” We review the trial court’s statutory interpretation
 
 de novo. See Qantas Airways Ltd. v. United States,
 
 62 F.3d 385, 387 (Fed.Cir.1995). In pertinent part, employer:
 

 means
 
 any carrier
 
 [subject to Interstate Commerce Commission jurisdiction]
 
 and any company which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith, and which operates any equipment or facility or performs any service (except trucking service, casual service, and the casual operation of equipment or facilities) in connection with the transportation of passengers or property by railroad,
 
 or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad,
 
 and any receiver, trustee, or other individual or body, judicial or otherwise, when in the possession of the property or operating all or any part of the business of any such
 
 employer.... The term “employer” shall also include railroad associations, traffic associations, tariff bureaus, demurrage bureaus, weighing and inspection bureaus, collection agencies and other associations, bureaus, agencies, or organizations controlled and
 
 *1115
 
 maintained wholly or principally by two or more employers as hereinbefore defined and engaged in the performance of services in connection with or incidental to railroad transportation.
 

 I.R.C. § 3231(a) (emphasis added). Congress apparently intended this definition of employer to cover “substantially all those organizations which are intimately related to the transportation of passengers or property by railroad in the United States.”
 
 See
 
 S.Rep. No. 75-818, at 4 (1937). The parties do not dispute that the Trustee was an employer from January 1, 1982, until December 31, 1984, when the workers performed obligations entitling them to possible repayment of the wage reduction. The Trustee derived his employer status firom the Railroad’s status as a carrier. Chicago Milwaukee argues that after the Railroad’s carrier status ended, neither the Trustee nor CMC Real Estate held employer status. We disagree.
 

 Any “company [that] is directly or indirectly ... controlled” by a carrier and that “performs [virtually] any service ... in connection with the transportation of passengers or property by railroad” also may be an employer.
 
 See
 
 I.R.C. § 3231(a). Treasury regulation § 31.3231(a)-l(b) advises that “control” may arise from “agreements, licenses, or any other devices [that] insure that the operation of the company is in the interest of one or more carriers.” Via contracting, among other things, a carrier may create obligations that survive its railroad operations. Its control thereby may outlive it temporarily: to the extent possible, its successor, a bankruptcy Trustee, or some other individual or entity must fulfill many of its obligations. The promise of such fulfillment serves an operating carrier’s interests. In this case, the contingent promise of wage repayment allowed the Railroad to lower operating costs. At least until its former employees received repayment of the wage reduction, the Railroad’s control endured.
 

 Whether an employer paid the remuneration leaves unresolved whether it was compensation, which “means any form of money remuneration paid to an individual for services rendered as an employee to one or more employers,” I.R.C. § 3231(e)(1) (Supp. II 1984). Chicago Milwaukee argues that the repayment of the wage reduction did not eonstitúte compensation under the Tax Act. It contends, more specifically:
 

 While the individuals were performing services for [the Railroad], they received contemporaneous compensation for their services (albeit at a reduced wage) with no clear entitlement to any additional payments. Whether additional payments ever would be made, how much they would be, and when they might be received depended on a number of conditions eventually that were beyond the employees’ control and unrelated to the services that they provided_ Those conditions were satisfied, but the fact that they were satisfied years after the fact does not transform the contingent payments into a “direct exchange” of money for services that qualifies as “compensation” under the [Tax Act].
 

 But whether remuneration is compensation does not depend upon the absence of conditions beyond employees’ control. Otherwise, compensation would hardly exist. The solvency of any business, which affects its ability to pay employees, always depends upon exogenous and unpredictable events and actors. Furthermore, the amount of repayment of the wage reduction that any individual received depended not only upon the adjusted sale price of the Railroad’s assets, it also depended upon the services each performed, whether determined by hours worked or otherwise. The repayment of the reduction was compensation.
 

 Conclusion
 

 Accordingly, we affirm the judgment of the Court of Federal Claims.
 

 AFFIRMED.